

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-23-2003

# Zubeda v. Atty Gen USA

Precedential or Non-Precedential: Precedential

Docket No. 02-2868

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"Zubeda v. Atty Gen USA" (2003). *2003 Decisions.* Paper 400.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/400

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed June 23, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 02-2868

TAKKY ZUBEDA,

Petitioner

v.

JOHN ASHCROFT, ATTORNEY GENERAL
OF THE UNITED STATES,

Respondent

Petition for Review of a Decision of the
Board of Immigration Appeals
A78-824-095

Argued: April 1, 2003

Before: McKEE and SMITH, *Circuit Judges*,
and HOCHBERG, *District Judge*\*

(Opinion filed: June 23, 2003)

---

\* The Honorable Faith Hochberg, District Judge of the United States
District Court for the District of New Jersey, sitting by designation.

JUDITH BERNSTEIN-BAKER, ESQ.
AYODELE GANSALLO, ESQ.
HIAS and Council Migration Service
 of Philadelphia
2100 Arch Street, 3rd Floor
Philadelphia, PA 19103

JONATHAN H. FEINBERG, ESQ.
 (Argued)
Kairys, Rudovsky, Epstein &
 Messing, LLP
924 Cherry Street, Suite 500
Philadelphia, PA 19107
*Attorneys for Petitioner*

ROBERT D. McCALLUM, ESQ.
Assistant Attorney General
Civil Division
TERRI J. SCADRON, ESQ.
Assistant Director
ANTHONY W. NORWOOD, ESQ.
Senior Litigation Counsel
JOHN M. MCADAMS JR., ESQ.
STACY S. PADDACK, ESQ. (Argued)
Attorney
Office of Immigration Litigation
Civil Division
U.S. Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, D.C. 20044
*Attorneys for Respondent*

**OPINION OF THE COURT**

McKEE, *Circuit Judge.*

Takky Zubeda asks us to review the decision of the Board of Immigration Appeals (the "BIA") vacating an Immigration Judge's ruling granting her relief from an order of removal. Although the Immigration Judge denied Zubeda's petition

for asylum and withholding of deportation, he found that she was entitled to relief under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (hereinafter referred to as the "Convention Against Torture" or the "Convention"). The BIA reversed that ruling and ordered Zubeda removed to the Democratic Republic of the Congo. The BIA's decision was based upon its conclusion that the record did not support the Immigration Judge's finding that Zubeda would likely be detained if returned to the DRC. Although it appears that the Immigration Judge may have taken administrative notice of that fact, the record is not clear as to how the Immigration Judge concluded that Zubeda would likely be detained if deported.

Inasmuch as the INS agrees that the most appropriate resolution is remand to the Immigration Judge for clarification and additional evidence, we will grant Zubeda's petition for review and remand the matter to the Immigration Judge. Moreover, inasmuch as the government has also agreed to allow Zubeda to raise the issue of her membership in the Bembe tribe on remand, the Immigration Judge will also be able to consider any impact Zubeda's tribal identity may have on her claim for asylum, withholding of deportation, or relief under the Convention Against Torture.[2]

## I. FACTS AND PROCEDURAL HISTORY

Takky Zubeda is a twenty-eight year old female who is native to, and a citizen of, the Democratic Republic of the Congo (the "DRC"). She is legally married to a lawful permanent resident of the United States who entered this country as a refugee from the DRC in 1993. In 1999, he traveled briefly to Tanzania, where he and Zubeda were married. After their marriage, Zubeda returned to the Congo and lived with her husband's parents for 22 months.[3]

2. Remand is not necessary if the record does not support a claim for relief under the Convention Against Torture. Therefore, we will also determine whether the record could, as a matter of law, support a claim for relief under that Convention.

3. Zubeda's husband is currently in the process of becoming a naturalized US citizen. His petition to allow her to join him in the US

Her current problems with the INS began when she was detained in December of 2000 while attempting to enter the United States without proper documentation after arriving at an airport in New York City. Zubeda was referred to an INS Asylum Officer for a "credible fear" interview after she expressed her fear of being returned to the DRC. The Asylum Officer found her credible and concluded that she had established a credible fear of persecution if returned to the DRC.

The INS served a Notice to Appear on Zubeda on February 2, 2001. It charged that Zubeda is removable from the United States under section 212(a)(6)(C)(i) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1182(a)(6)(C)(i), for seeking admission to the United States by fraud or willful misrepresentation, and under section 212(a)(7)(A)(i)(I) of the INA, 8 U.S.C. § 1182(a)(7)(A)(i)(I), for failing to possess a valid entry document when seeking admission to the United States.

She thereafter filed a petition with the INS in which she requested asylum and withholding of deportation, and "also sought protection under Article 3 of the Convention," Zubeda's Br. at 3. Zubeda appeared with counsel at the hearing on that petition and conceded that she was removable under INA § 212(a)(7)(A)(i)(I) because she lacked valid travel documents. She denied seeking admission by fraud or willful misrepresentation, and the Immigration Judge dismissed those grounds after the INS failed to produce any proof of those allegations.

Several documents were admitted into evidence at the hearing including official country reports prepared by the U.S. State Department, as well as reports from private organizations such as Human Rights Watch and Amnesty International. The evidence also included Zubeda's asylum application, the record of the determination of the credible fear interview, and an affidavit from an expert witness. Zubeda was the only witness who actually testified.

was approved by the INS on October 10, 2002. Zubeda's Br. at 9 n.3. Zubeda claims that there is a wait of over four years for spouses of legal permanent residents to enter the US as immigrants.

Inasmuch as the conditions described in that evidence are key to the Immigration Judge's final determination, and the BIA's subsequent reversal of it, we will summarize the testimony and country reports in some detail:

### A. The Democratic Republic of Congo.

According to the evidence that was introduced, the DRC (formerly "Zaire"), has a history of flagrant human rights abuses being perpetrated by both government and rebel forces. The country is currently embroiled in a vicious civil war. Six other African countries have aligned themselves with one of the two sides in that war. The anti-government faction in that war is composed of two factions: the Rassemblement Congolais Pour La Democratie (Congolese Rally for Democracy or "RCD"), and the Mouvement Pour Liberation du Congo (Movement for the Liberation of Congo or "MLC"). These fighters are supported by Tutsi factions from Burundi and Rwanda and by the Uganda People's Defense Forces. The anti-government forces control the eastern part of the DRC, including South Kivu which is Zubeda's home region. Government forces, known as Forces Armees Congolaises (Congolese Armed Forces or "FAC"), are supported by the governments of Angola, Namibia, Zimbabwe and by Hutu militants from Rwanda known as the "interahamwe." Armed groups that support the government known as "mayi-mayi," or "mai mai," also often fight in rebel held areas.

Reports of Amnesty International portray the DRC as a brutal and life-threatening environment with a predatory government capable of wielding genocidal force while teetering on the brink of collapse. A Report states:

> [A]t least 300,000 civilians have fled to neighboring countries, while more than one million people have been internally displaced in conditions that have caused numerous deaths from disease, starvation and exposure. This is a snapshot of a catalogue of human rights abuses and suffering that the people of the DRC have been subjected to since August 1998 by forces whose foreign and Congolese political and military leaders claim to be fighting for security or sovereignty.

> In reality, many of the leaders are involved in a fight for political and economic control of the DRC. Amnesty International has concluded that these leaders are perpetrating, ordering or condoning atrocities on a large and systematic scale, and deliberately violating people's individual and collective right to security and sovereignty.

*****

> . . . [S]ince the start of 1999, hundreds of unarmed civilians have been killed as a result of direct or indiscriminate attacks by forces loyal to President Kaliba in clear violation of Common Article 3 of the Geneva Conventions.

Amnesty International Reports, *Democratic Republic of Congo: Killing Human Decency* (May 2000), at 1, 17.[4]

Zubeda introduced evidence to establish that her family was from Baraka, a village in the South Kivu Province in the eastern part of the DRC. Zubeda testified that her mother had been raped by soldiers in November of 2000.[5] Zubeda was then living in a nearby village with her in-laws, but she returned to Baraka to care for her mother after the rape. Her father intended to report the rape to human rights groups working in the area, but before he could do so, ten soldiers forcefully entered the family home and brutalized the family. Zubeda said that these soldiers tied her father and brother and forced them to watch as they gang raped her. When they were finished, the soldiers decapitated her father and brother with machetes and set fire to the family home while Zubeda's mother and sister were still inside. Zubeda testified that she thought the

---

4. Similar descriptions of conditions in the DRC are found in reports prepared by Human Rights Watch. *See* Human Rights Watch, *Eastern Congo Ravaged: Indiscriminate Attacks and Extrajudicial Executions of Civilians* (2000) and *Eastern Congo Ravaged: Society Under Attack* (2000).

5. It is unclear whether these soldiers were government soldiers, rebel soldiers, soldiers from the other countries supporting either side in the civil war, mai mai or interahamwe. Zubeda testified that she believes, based on their uniforms, that they were rebel soldiers.

soldiers committed these atrocities to prevent her father from reporting her mother's rape to human rights workers.

Zubeda said that after the gang rape, she was taken to a detention camp or military camp where she was again sexually abused and forced to clean and cook for the soldiers. Zubeda claims that she was finally able to escape from the camp along with three other women and flee to neighboring Tanzania. There, she received assistance from members of a religious organization who gave her $100 and a passport belonging to one of the workers. Zubeda claimed that she was told that the passport would allow her entry into the United States. According to Zubeda, one of the female workers took her to the train station in Dar Es Salaam, Tanzania, and then helped her board the plane that brought her to New York. Zubeda admitted that she falsely told INS inspectors in New York that she had come to visit her brother and attend bible school. She explained that she lied because she became frightened about telling the truth when INS inspectors threatened to return her to the DRC.

Zubeda claims that her experience is typical for South Kivu Province which is the site of massive human rights abuses as documented in various country reports. A report by Human Rights Watch states:

> [R]ape and other forms of sexual violence have become widespread as the war in eastern Congo has grown increasingly bitter. One Congolese women's rights group registered 115 rapes between April and July 1999 in just two regions of Katana and Kalehe in South Kivu with thirty in just one April 5 attack on Bulindi and Maitu. Groups of ten or more men sometimes gang rape one woman. Assailants sometimes take women hostage to be used as sexual slaves. Both soldiers and armed opposition groups have engaged in such abuses, but Hutu armed groups are reported to have perpetrated rapes more often than other groups. They use sexual violence to terrorize civilians, especially those thought to be RCD supporters and most especially those who participate in civil self-defense forces.

Human Rights Watch: *Eastern Congo Ravaged: Indiscriminate Attacks*, at 5.[6] The State Department paints an even more horrifying picture of terror pervading the DRC.

> There were reports that Rwandan and Ugandan soldiers allegedly raped women during extensive fighting in Kisangani in May and June . . . . Rwandan troops and RCD rebels also reportedly engaged in rape of women in public and often in the presence of their families and in-laws. A woman raped in this manner generally is forced out of the village, leaving her husband and children behind. In June, an RCD/Goma soldier . . . stopped a young girl, Fitina, on the road between Baraka and Mboko and raped her. After he raped her, the soldier discharged his weapon into her vagina. According to a number of credible human rights organizations, marauding bands of armed men in the occupied territories often put victims of rape through further painful humiliations by inserting rocks, sharp sticks, and hot peppers into their vaginas.

U.S. State Department, *2000 Country Reports on Human Rights Practices: Democratic Republic of Congo* (February 2001), at 10-11. The reign of terror documented by the State Department includes the following atrocities from Zubeda's region:

> On May 14 and 15, in response to an apparent Mai Mai slaying of RCD commander Ruzagura during an ambush on his motorcade, RCD/Goma forces killed hundreds of civilians in and around the town of Katogota in South Kivu Province. According to some reports, RCD soldiers killed as many as 300 villagers by slitting their throats.
>
> *****
>
> Between August 18 and 24, following a period of intense fighting between Mai Mai and RCD forces in the Shabunda region of South Kivu Province, the RCD carried out a punitive campaign against the villages

---

6. This is consistent with reports of the U.S. State Department as well as the conditions Zubeda described in her testimony.

> between the towns of Lulingu and Nzovu. Soldiers sent by RCD Commandant Macumu burned the villages; more than 300 villagers were burned alive and 3,000 homes were destroyed.
>
> *****
>
> On July 19, in the Fizi district of South Kivu Province, Banyamulenge and Burundial soldiers killed an estimated 150 persons on the town of Lubamba by slitting their throats. The local population sought refuge in the nearby town of Dine.
>
> *****
>
> There were numerous reported killings along the road from Uvira to Bukavu in South Kivu Province . . . . The climate of insecurity in the occupied territories and particularly in the Kivu Province forced many local residents to abandon their homes and created food shortages as armed bandits kept farmers from working in their fields.

*Id.* at 6-7.

### B. Asylum and Withholding of Deportation.

The Attorney General only has discretion to grant asylum to a deportable alien if the alien qualifies as a "refugee." *See* INA § 208 (a), 8 U.S.C. § 1158(a). "Refugee" is defined by statute as:

> [A]ny person who is outside any country of such person's nationality . . . and who is unable or unwilling to avail himself or herself of the protection of that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

8 U.S.C. § 1101(a)(42)(A). Therefore an alien seeking asylum must present some evidence that the alleged persecutors want to punish him/her "on account of" one of the five enumerated grounds in order to be eligible for a grant of asylum. *INS v. Elias-Zacarias*, 502 U.S. 478 (1992).

Courts have frequently explained that the "well-founded fear of persecution" that an alien must demonstrate involves both a *subjectively* genuine fear of persecution and an *objectively* reasonable possibility of persecution. *INS v. Cardoza-Fonseca*, 480 U.S. 421, 430-31 (1987). The subjective prong requires a showing that the fear is genuine. *Mitey v. INS*, 67 F.3d 1325, 1331 (7th Cir. 1995). Determination of an objectively reasonable possibility requires ascertaining whether a reasonable person in the alien's circumstances would fear persecution if returned to the country in question. *Chang v. INS*, 119 F.3d 1055, 1065 (3d Cir. 1997). The law does not require that asylum be granted even if the alien qualifies as a "refugee." Rather, that is left to the discretion of the Attorney General and is decided on a case by case basis.

Withholding deportation under INA § 243(h), 8 U.S.C. § 1253(h), is closely related to asylum. However, Congress has declared: the "Attorney General *shall not* deport or return an alien. . . to a country if the Attorney General determines that such alien's life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion." *Id.* (emphasis added). Therefore, the Attorney General must withhold deportation if the alien qualifies for relief under INA § 243(h).

In order to obtain mandatory withholding of deportation under § 243(h), the alien must first establish by a "clear probability" that his/her life or freedom would be threatened in the proposed country of deportation. *Janusiak v. INS*, 947 F.2d 46, 47 (3d Cir. 1991). "Clear probability" means that it is "more likely than not" that an alien would be subject to persecution. *INS v. Stevic*, 467 U.S. 407, 429-30 (1987). The "clear probability" standard is a more rigorous standard than the "well-founded fear" standard for asylum. *Janusiak*, 947 F.3d at 47. Thus, if an alien fails to establish the well-founded fear of persecution required for a grant of asylum, he or she will, by definition, have failed to establish the clear probability of persecution required for withholding of deportation. *Id.* Under both the "well founded fear" threshold required for asylum and the "clear probability" required for withholding of deportation,

the alien must establish that persecution he/she fears is "on account of" one of the enumerated classifications or activities incorporated into the definition of "refugee."[7]

### C. The Immigration Judge's Decision.

After receiving the aforementioned documentary evidence, and hearing Zubeda's testimony, the Immigration Judge concluded "that [Zubeda] has failed to present to me that quantum of credible testimony necessary to establish the basis of her claim [for asylum]." Administrative Record ("AR"), at 49. The Immigration Judge's support for this adverse credibility determination included citations to inconsistencies between Zubeda's testimony and her written asylum application which the Immigration Judge believed undermined Zubeda's credibility. A.R. at 49-51.

He then stated:

> I am not unaware of the atrocious human rights violations in the Congo, including the raping of women by security forces, and the indiscriminate murders of civilians by these forces. All in all, the government of the Congo is a miserable excuse of a sovereign government. However, the Congo does not hold a monopoly on abusive treatment of its citizens, and I cannot grant relief to an alien on the mere fact of hailing from such a country. Again, [Zubeda's] testimony is suspect for the reasons I have noted, and she has the burden of proof to present detailed and consistent testimony, which she has failed to do.

*Id.* at 51. Accordingly, the Immigration Judge denied Zubeda's claims for asylum and withholding of deportation.

However, the Immigration Judge held that Zubeda did qualify for relief under the Convention Against Torture. He reasoned:

> Can I state with any degree of confidence that [Zubeda] would be permitted to arrive in the Congo and immediately go about her business unmolested? No, I

---

7. "Race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A) § 1101(a)(42)(A).

can't, and neither can I state with any degree of certainty that [Zubeda] would [not] be physically harmed upon her return. But . . . I have little confidence that [she], whatever her background, would be treated with more deference than her fellow citizens, none of whom apparently is immune to government atrocities. It is clear from the evidence in this record that the Congolese government, through its security forces, are irresponsible as a whole and have no regard for the well being nor the human rights of citizens. Forcibly returning there any citizen of that troubled land . . . should give any judge great pause. At least I am convinced that [Zubeda] would be detained upon her arrival. Virtually every government detains its citizens for some period of time after that citizen is deported or forcibly removed from another country. But given the atrocious history and present country conditions of the Congo, I believe that [Zubeda] has shown the likelihood of being physically abused, perhaps raped, which is almost *modus operandi*, while detained. At least it is highly doubtful that [Zubeda] would be treated any more leniently than her fellow citizens under similar detention status.

*Id.* at 54. The Immigration Judge then granted relief under the Convention Against Torture, and the INS appealed that ruling to the BIA. The BIA reversed and Zubeda filed the instant petition for review.

## II.  STANDARD OF REVIEW

Since the BIA conducted a *de novo* review of the record, we are reviewing the BIA's decision, and not the ruling of the Immigration Judge. *Abdulai v. Ashcroft*, 239 F.3d 542, 548-49 (3d Cir. 2001). We sustain BIA's determination if there is substantial evidence in the record to support it. *Abdille v. Ashcroft*, 242 F.3d 477, 483 (3d Cir. 2001). "Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Senathirajah v. INS*, 157 F.3d 210, 216 (3d Cir. 1998) (quotation omitted). Under this deferential standard, "the BIA's finding must be upheld unless the evidence not only supports a contrary

conclusion, but compels it." *Abdille*, 242 F.3d at 483-84 (citing *INS v. Elias-Zacarias*, 502 U.S. 478, 481 & n. 1 (1992)). However, in order to place our review of the BIA's decision in its proper context, and to assist in determining if this record could support the relief the Immigration Judge afforded Zubeda, we will first discuss the requirements of the Convention Against Torture.

## A.   The Convention Against Torture.

Zubeda seeks protection under Article 3 of the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, opened for signature February 4,1985, S. Treaty Doc. No. 100-20, at 20 (1988), 23 I.L.M. 1027, 1028 (1984). The United States signed the Convention on April 18, 1988, and the Senate ratified it on October 27, 1990. 136 Cong. Rec. S17, 486-501 (daily ed. Oct. 37, 1990). It became binding on the United States in November of 1994 after President Clinton delivered the ratifying documents to the United Nations. U.N. Doc. 571 Leg/SER.E/13.IV.9 (1995); Convention, art. 27(2). The Foreign Affairs Reform and Restructuring Act of 1988 ("FARRA") initiated implementation of the Convention. Section 2242, Pub.L. No. 105-277, Div. G, 112 Stat. 2681-761 (Oct. 21, 1988) (codified at note to 8 U.S.C. § 1231). That legislation requires that "[n]o state . . . expel, return ('refouler') or extradite a person to another state where there are substantial grounds for believing that he would be in danger of being subjected to torture." *Id.* Accordingly, "it shall be the policy of the United States not to expel, . . or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture. . . . " *Id.*; *see also Li v. Ashcroft,* 312 F.3d 1094, 1103 (9th Cir. 2002).

"An applicant for relief on the merits under [Article 3] of the Convention Against Torture bears the burden of establishing 'that it is more likely than not that he or she would be tortured if removed to the proposed country of removal.'" *Sevoian v. Ashcroft*, 290 F.3d 166, 174-175 (3d Cir. 2002) (quoting 8 C.F.R. § 208.16(c)(2)). Unlike establishing a "reasonable fear of persecution" for asylum,

"[t]he standard for relief [under the Convention on Torture] has no subjective component, but instead requires the alien to establish, by objective evidence, that he[/she] is entitled to relief." *Id.* at 175. (citation and internal quotations omitted).

The alien's testimony, if credible, may be sufficient to sustain the burden of proof without corroboration. *Mansour v. Immigration and Nationalization Service,* 230 F.3d 902, 907 (7th Cir. 2000) (citing 8 C.F.R. § 208.16(c)(2)). If an alien meets his/her burden of proof, withholding removal under the Convention is mandatory just as it is for withholding of deportation under § 243(h). INA § 241(b)(3); 8 C.F.R. §§ 208.16 - 208.18.

Under the implementing regulations that were promulgated pursuant to the Convention,

> Torture is defined as an act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

8 C.F.R. § 208.18(a)(1).

"Torture is an extreme form of cruel and inhuman treatment and does not include lesser forms of cruel and inhuman treatment or punishment that do not amount to torture." 8 C.F.R. § 208.16(c)(3)(i). The Convention "draws a clear distinction between torturous acts as defined in Article 1 and acts [of cruelty] not involving torture referenced in Article 16." *In Re J-E,* 23 I. & N. Dec. 291, 295 (March 22, 2002). "The severity of the pain and suffering inflicted is a distinguishing characteristic of torture." *Id.*

Rape can constitute torture. Rape is a form of aggression constituting an egregious violation of humanity. *See*

Margaret A. Lyons, *Hearing the Cry Without Answering the Call: Rape, Genocide And The Rwandan Tribunal*, 28 Syracuse J. Int'l L. 99, 99-100 (2001). The scarring effects of rape compare with "psychological sequelae of . . . survivors of abuse constituting torture under international law. . . ." *Lopez-Galarza v. INS*, 99 F.3d 954, 963 (9th Cir. 1996) (citing Note, *Torture by Means of Rape*, 84 Georgetown L.J. 1913, 1931 (1996)). "The effects of rape appear to endure for months or even years. One study found that twenty-six per cent [of the rape survivors studied] felt that they had not yet recovered four to six years after their rapes." *Id.*, at n. 10 (citation omitted).

Moreover, courts have equated rape with conduct recognized under the law of nations as torture. In *Al-Saher v. INS*, 268 F.3d 1143, (9th Cir. 2001), the court granted the petition for review of an alien seeking to avoid deportation to Iraq under the Convention Against Torture. In concluding that the record supported the alien's claim that he would likely be tortured if returned, the court stated:

> torture techniques [reported in country reports for Iraq in 1997] included branding, electric shocks administered to the genitals, and other areas, beating, burning with hot irons, suspension from rotating ceiling fans, dripping acid on the skin, *rape*, breaking limbs, denial of food and water, and *threats to rape* or otherwise harm relatives. . . .

*Id.*, at 1147 (emphasis added). The court expressed no ambiguity or uncertainty in referring to those receiving such treatment as "torture victims." *Id.* After reviewing the record, the court concluded that "[i]f forced to return to Iraq, it is likely that Al-Saher would be tortured again." *Id.* at 1148; s*ee also Kadic v. Karadzic*, 70 F.3d 232, 242 (2d Cir. 1995) (referring to allegations of "murder, rape, forced impregnation, and other forms of torture,"); *In re Extradition of Suarez-Mason*, 694 F.Supp. 676, 682 (N.D. Cal. 1988) (stating "shock sessions were interspersed with rapes and other forms of torture.").[8] Moreover, Congress has defined

---

8. *See also Farmer v. Brennan*, 511 U.S. 825, 952 (1994) (Blackmun concurring) (referring to prison rape as "the equivalent of " and "nothing less than torture.").

torture in a different context as including "the use of *rape and other forms of sexual violence*." Torture Victims Relief Act of 1998, Pub. L. No. 105-320 § 3, 112 Stat. 3016 (1998) (emphasis added).[9]

Similarly, the BIA has held that rape can constitute sufficient persecution to support a claim for asylum. *Matter of DV*, Interim Dec. 3252 (BIA 1993). Two courts of appeals have also held that rape and sexual violence against women may constitute sufficient persecution to support a grant of asylum. *See, e.g., Shoafera v. INS*, 288 F.3d 1070 (9th Cir. 2000); *Angoucheva v. INS*, 106 F.3d 781 (7th Cir. 1997); *Lopez-Galarza v. INS*, 99 F.3d 954 (9th Cir. 1996); *Lazo-Majano v. INS*, 813 F.2d 1432 (9th Cir. 1996), *overruled on other grounds* by *Fischer v. INS*, 79 F.3d 1432 (9th Cir. 1996)(en banc).

The severe pain and suffering endemic to rape is a necessary but not sufficient element of torture under the Convention. The regulations also require us to consider: the intent of the persecutor(s), whether the suffering will be imposed for one of the purposes specified under the Convention, and whether it will likely be inflicted with the knowledge or acquiescence of a public official with custody or control over the victim. 8 C.F.R. § 208.18(a).

Although the regulations require that severe pain or suffering be "intentionally inflicted," *id.*, we do not interpret this as a "specific intent" requirement. Rather, we conclude that the Convention simply excludes severe pain or suffering that is the unintended consequence of an intentional act. *See* Deborah E. Anker, *Law of Asylum in the United States* 465, 486 (3d ed. 1999) (citing J. Hermann Burgers & Hans Danelius, *The Convention Against Torture: A Handbook on the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment* 41). The regulation does state: "in order to constitute torture, an act must be specifically intended to inflict severe physical or mental pain or suffering." 8 C.F.R. § 208.18(a)(5).

---

9. The BIA has itself, in an unpublished opinion, held that rape and sexual assault constitute torture within the terms of the Convention Against Torture. *See, e.g., Matter of Kuna*, A76491421 (BIA July 12, 2001) (unpublished decision).

However, the regulation immediately explains: "[a]n act that results in unanticipated or unintended severity of pain and suffering is not torture." The intent requirement therefore distinguishes between suffering that is the accidental result of an intended act, and suffering that is purposefully inflicted or the forseeable consequence of deliberate conduct. However, this is not the same as requiring a specific intent to inflict suffering. Our conclusion in this regard is consistent with 8 C.F.R. § 208.18(a). A subsection of that regulation provides:

> (4) In order to constitute torture, mental pain or suffering must be prolonged mental harm caused by or resulting from:

> (i) The intentional infliction *or threatened* infliction of severe physical pain or suffering;

> (ii) The administration or *application, or threatened* administration or application, of mind altering substances or other procedures calculated to disrupt profoundly the senses or the personality;

> (iii) The *threat* of imminent death; or

> (iv) The *threat* that another person will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind altering substances or other procedures calculated to disrupt profoundly the sense or personality.

8 C.F.R. § 208.18 (a) (4) (emphasis added). Therefore, the Convention does not require that the persecutor actually intend to cause the threatened result. It is sufficient if the persecutor causes severe psychological suffering by threatening beatings for one of the specified purposes such as extracting information or coercing a confession. The persecutor need not intend to "make good" on his/her threats for the resulting suffering to constitute torture so long as the threats are sufficiently protracted, and/or of such an egregious nature to elevate the forseeable suffering to the level of "torture."

Moreover, requiring an alien to establish the specific intent of his/her persecutors could impose insurmountable obstacles to affording the very protections the community of

nations sought to guarantee under the Convention Against Torture. *See Bolanos-Hernandez v. INS,* 767 F.2d 1277, 1285 (9th Cir. 1985).[10]

As we have noted, the Convention requires that the severe pain or suffering be imposed for certain specified purposes "such . . . as obtaining information[ ] . . . or a confession, . . . *or intimidating or coercing* him or her or a third person, . . . ." 8 C.F.R. § 208.18 (a) (1) (2000). This record could support a finding that the conduct described in the DRC was for the purpose of coercing *and* intimidating Zubeda and/or members of her family. This is particularly true given the testimony regarding gang rape, and evidence that family members were forced to watch. It is difficult to imagine conduct that is more intimidating.

The Immigration Judge apparently concluded that, given the record of systematic rape in the DRC, and the likelihood that Zubeda would be detained upon her return, it was likely that she would be raped while in official detention. That being the case, those detaining her would, by definition, be government agents.

Zubeda therefore could satisfy the final burden of proving that future torture would be at the hands of, or with the acquiescence of, government agents.[11] Although there may be some doubt about the proper apportionment of blame between government agents and local militia or rebels for some past acts of torture, there can be little doubt that government agents would be responsible for any detention Zubeda would have to undergo upon her return and any rape while detained.[12]

---

10. As noted by Prof. Karen Musalo, the law has long accepted that "[t]he victim may not know the exact motivation of his or her persecutor." Karen Musalo, *Irreconcilable Differences? Divorcing Refugee Protections from Human Rights Norms*, 15 Mich. J. Int'l L. 1179, 1210 (1994).

11. *See* 8 C.F.R. § 208.18 (a) (torture must be "inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.)"

12. Even though we assume that future rapes while detained would not involve family members or third persons being forced to endure

### C. The BIA's Decision.

In a four paragraph decision, only two paragraphs of which were devoted to discussing the legal principles involved, the BIA sustained the government's appeal, vacated the Immigration Judge's decision, and ordered Zubeda removed to the Congo. As noted above, since Zubeda appeals from the BIA's *de novo* review of the Immigration Judge's decision, we review the BIA's decision; not the decision of the Immigration Judge. *Abdulai*, 239 F.3d at 548-49 (3d Cir. 2001).[13]

The BIA based its ruling upon *Matter of J-E*, I&N Dec. 291 (BIA 2002). There, with seven Board members dissenting, the BIA concluded that conditions in Haitian prisons did not constitute torture under the Convention. Accordingly, a majority of the Board held that the Convention Against Torture did not preclude returning a Haitian national to Haiti. In reversing the decision of the Immigration Judge here, the BIA noted the similarities between the conditions in the Congo and the evidence in *J-E* as follows:

> we found therein that evidence of the occurrence in Haitian prisons of *isolated* instances of mistreatment that may rise to the level of torture as defined in the Convention Against Torture is insufficient to establish that it is more likely than not that the respondent will be tortured if returned to Haiti.

(Emphasis Added). AR at 3.[14]

---

watching, the Immigration Judge could reasonably conclude that any custodial rape would nevertheless involve coercion and intimidation. Indeed, it is difficult to imagine how one could reasonably conclude that the conduct described in the country reports could have any other purpose.

13. If, however, the BIA had stated that it adopted the Immigration Judge's ruling for the reasons set forth therein, and did not provide an independent analysis, we would review the decision of the Immigration Judge as if it were the decision of the BIA. *Abdulai v. Ashcroft*, 239 F.3d 542, 549 n. 2 (3d Cir. 2001).

14. The BIA's reference to "isolated" instances of mistreatment is both puzzling and troubling. The relevant reports here describe mistreatment in the DRC as "systematic" and "large scale," not "isolated instances" as the BIA suggests.

In addition, the BIA found that the evidence did not support the Immigration Judge's finding that Zubeda would likely be detained upon return to the Democratic Republic of the Congo. The BIA stated:

> The background evidence establishes that prison conditions in the Congo remain harsh and life threatening. The Immigration Judge found that the respondent would be detained upon return to the Congo. However, we note a dearth of evidence to support any finding that the respondent is likely to be detained for any reason.

AR at 3. The BIA also concluded that Zubeda "failed to establish that the harsh prison conditions establish a probability that she will be detained in a prison in the Congo, much less that she will be individually targeted for any harm by the government of the Congo." *Id.*

The BIA's rather terse analysis completely ignores the basis of the Immigration Judge's decision. Obviously, *prison conditions* do not establish a likelihood of detention, and the Immigration Judge's ruling is not to the contrary. Rather, he relied upon the uncontested country reports prepared by the State Department and the aforementioned human rights organizations. He reached a conclusion about the rampant brutality in the DRC and the terror that is inflicted upon its citizens, particularly those who reside in the region Zubeda is from. The Immigration Judge then appears to have taken administrative notice of the likelihood that Zubeda would be detained if forced to return to the DRC and reached the seemingly unremarkable conclusion that, given the conditions in the country, and the documented frequency with which soldiers resort to rape, there was a likelihood that Zubeda would be raped if detained. The BIA's analysis is therefore seriously flawed.

As the Court of Appeals for the Seventh Circuit stated in *Mansour*: "The BIA in a minimalistic and non-detailed manner addressed [the alien's] torture claim; leaving us to ponder whether the BIA sufficiently focused on [her] claim or merely concluded it was not viable because of its determination that [the alien's] prior testimony on asylum was not credible." 230 F.3d at 908.

Moreover, the Immigration Judge's rejection of Zubeda's claim for asylum and withholding of deportation does not control the analysis of her claim for relief under the Convention Against Torture. As noted above, asylum and withholding of deportation require that the alien be both a "refugee," and establish either a well founded fear, or probability of persecution, "on account of " at least one of five specified grounds. The Convention Against Torture is not limited to "refugees" nor does persecution have to be "on account of " political opinion, religious or social group, etc. Rather, the Convention simply seeks to prevent any country from having to return someone to a place where it is likely he/she will be tortured.

Yet, the BIA reasoned: "the IJ specifically found [Zubeda] to be incredible and the respondent has not contested that finding. As such, the respondent has failed to meet her burden of proof. Accordingly, the Service's appeal will be sustained." AR at 3. However, Zubeda's credibility for purposes of establishing her asylum and withholding of deportation claims does not defeat her ability to "meet her burden of proof " under the Convention Against Torture. Allowing the taint of the earlier adverse credibility determination to bleed through to the BIA's consideration of her claim under the Convention Against Torture without further explanation is therefore error.[15]

> [T]he Board failed to recognize the central distinction that claims for relief under the Convention are analytically separate from claims for asylum under INA § 208 and for withholding of removal under INA § 241(b)(3). Put another way, a claim under the Convention is not merely a subset of claims for either asylum or withholding of removal.

*Kamalthas*, 251 F.3d at 1283. This aspect of the BIA's opinion is even more troubling because, as we shall explain, the record is not adequate to support the adverse credibility determination that the BIA adopted.

The BIA accepted the adverse credibility ruling of the

---

15. Inasmuch as this issue may come before the BIA again following remand to the Immigration Judge, it is important to note this error.

Immigration Judge without question even though the Immigration Judge's conclusion regarding Zubeda's testimony was, in part, based upon conflicts between her testimony during the immigration hearing on the one hand, and statements made in her asylum affidavit and during her asylum interview on the other. In *Balasubramanrim v. INS*, 143 F.3d 157, 161 (3d Cir. 1998), we cautioned against placing too much weight on inconsistencies between an asylum affidavit and subsequent testimony at a hearing before an Immigration Judge. Caution is required because of the numerous factors that might make it difficult for an alien to articulate his/her circumstances with the degree of consistency one might expect from someone who is neither burdened with the language difficulties, nor haunted by the traumatic memories, that may hamper communication between a government agent in an asylum interview and an asylum seeker. This is particularly true when we consider that such an alien may have tried to suppress the very memories and details that have suddenly become so important to establishing his/her claim. *Id* at 164.[16] Recently, in *Ezeagwuna v. INS*, 325 F.3d 396 (3rd Cir. 2003), we cited our decisions in *Balasubramanrim* and *Senathirajah*, and stated, "The manner of eliciting [information in airport interviews] is crucial to their probative value." *Id.* at 408. Yet, here the BIA accepted the Immigration Judge's partial reliance upon contradictions in Zubeda's testimony at the deportation hearing and statements during her airport interview without any information about the circumstances of that interview. The BIA correctly notes that Zubeda does not challenge the Immigration Judge's credibility determination on her asylum and withholding of deportation claims. However, that does not allow the BIA to rely upon those

---

16. "There are a series of common psychological responses to torture and human rights violations as recognized by the Manual on the Effective Investigation and Documentation of Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment." Piwowarczyk, *Seeking Asylum: A Mental Health Perspective*, 16 Geo. Immigr. L.J. 155, 157 (2001) (citing the MANUAL ON THE EFFECTIVE INVESTIGATION AND DOCUMENTATION OF TORTURE AND OTHER CRUEL, INHUMAN OR DEGRADING TREATMENT OR PUNISHMENT (1999) (submitted to the United Nations Office of the High Commissioner for Human Rights)).

rulings on this record in denying Zubeda's claim under the Convention Against Torture.[17]

The BIA cavalierly dismissed the substantial documentation of conditions in the DRC by suggesting that Zubeda's claim for relief was somehow limited to "background evidence establish[ing] that prison conditions in the Congo remain harsh and life threatening." AR at 3. Although the BIA "is not required to 'write an exegesis' on every contention," *Mansour v. INS*, 230 F.3d 902, 908 (7th Cir. 2000), the "analysis" offered here is simply inadequate to afford the meaningful review that both Zubeda and the INS deserve. The BIA stated that it had considered the "background evidence" and we assume that this is a reference to the country reports that were introduced before the Immigration Judge. Official as well as unofficial country reports are probative evidence and can, by themselves, provide sufficient proof to sustain an alien's burden under the INA. *See Kamalthas v. INS*, 251 F.3d 1279, 1284 (9th Cir. 2001).

However, the BIA then proceeds by mischaracterizing the reports as "background evidence" relating to prison conditions in the DRC. As is evident from excerpts set forth above, the country reports that were introduced establish the extent to which armed forces terrorize residents in the DRC, especially Zubeda's region of that country. They do not address prison conditions in the manner that the BIA suggests in its exceedingly brief reference to "background evidence." Reducing Zubeda's claim to an attack on the kind of inhumane prison conditions that formed the basis of the Board's decision in *Matter of J-E*, totally ignores the fact that this record is replete with reports from government agencies and human rights organizations that detail what appear to be country wide, systematic incidents of gang rape, mutilation, and mass murder. Country reports such

---

17. To his credit, the Immigration Judge recognized this concern regarding reliance upon airport interviews and cited our opinions in *Balasubramanrim,* and *Senathirajan, See* AR at 51. Nevertheless, he proceeded to rely upon Zubeda's statements in the asylum petition and the airport interview without any evidence of the circumstances under which those statements were obtained or the affidavit executed.

as the ones Zubeda introduced here are "the most appropriate and perhaps the best resource" for "information on political situations in foreign nations." *Kazlauskas v. INS*, 46 F.3d 902, 906 (9th Cir. 1995) (quoting *Rojas v. INS*, 937 F.2d 186, 190 n.1 (5th Cir., 1991)).

Of course, reports of generalized brutality within a country do not necessarily allow an alien to sustain his/her burden under the Convention Against Torture. As the Immigration Judge correctly noted: "[T]he Congo does not hold a monopoly on abusive treatment of its citizens, and I cannot grant relief to an alien on the mere fact of hailing from such a country." AR at 51. However, as the Immigration Judge also apparently realized, "gross, flagrant or mass violations of human rights within the country of removal . . ." can corroborate an alien's claim that he/she will be subjected to torture upon return; thus allowing the alien to present the proof necessary for establishing a claim under the Convention Against Torture. 8 C.F.R. § 208.16 (c)(3); *Kamalthas,* 251 F.3d at 1284. The BIA's *de novo* analysis never considers this.

The applicable regulations require that *all* relevant evidence be considered in determining the likelihood of future torture. This includes evidence of past torture as well as conditions in the country that would increase the likelihood of history repeating itself. The regulations provide:

> (3) In assessing whether it is more likely than not that an applicant would be tortured in the proposed country of removal, all evidence relevant to the possibility of future torture shall be considered, including, but not limited to:
>
> (i) Evidence of past torture inflicted upon the applicant;
>
> (ii) Evidence that the applicant could relocate to a part of the country of removal where he or she is not likely to be tortured;
>
> (iii) *Evidence of gross, flagrant or mass violations of human rights within the country of removal, where applicable*; and

  (iv) Other relevant information regarding conditions in the country of removal.

8 C.F.R. § 208.16(c)(3) (emphasis added).

### III. NECESSITY FOR A REMAND

As we have summarized above, the foundation of Zubeda's claim for relief under the Convention Against Torture is that she will likely be detained by the government of the DRC if forcibly returned and that it is more likely than not that she will be raped while in detention there.[18] As noted above, in granting Zubeda relief under the Convention Against Torture, the Immigration Judge wrote, "I am convinced that [Zubeda] would be detained upon her arrival. Virtually every government detains its citizens for some period of time after that citizen is deported or forcibly removed from another country." A.R. at 54.

The BIA reversed because of what it described as "a dearth of evidence to support any finding that [Zubeda] is likely to be detained for any reason." *Id.* at 3. During argument, the attorney for the INS devoted much of her time to arguing that the record simply did not support the Immigration Judge's conclusion about the likelihood of Zubeda's detention upon return to the DRC. Yet, as we have already noted, it appears from the Immigration Judge's opinion that he simply took administrative notice of that fact. Zubeda claims that the BIA's concern over a "dearth of evidence to support [Zubeda's] detention" is therefore entirely unremarkable. Zubeda argues that the law does not require that she prove anything as obvious as the likelihood of detention upon forcible return to her homeland after deportation for attempting to illegally enter another country. According to Zubeda, the Immigration Judge's factual conclusion regarding events that will likely follow upon her return is too commonly known to require proof, and the country reports allow a reasonable fact finder to make a decision about the likelihood of rape while

---

18. Counsel has argued that Zubeda is even more likely to be raped in detention because she is from a rebel-held region.

held in detention in the DRC. She therefore asks us to conclude that the BIA erred in not deferring to the Immigration Judge's factual conclusion based upon an administratively noticed fact.

In *McLeod v. Immigration and Naturalization Service*, 802 F.2d 89 (3d Cir. 1986), we noted that an agency can take official or administrative notice of commonly acknowledged facts. We explained:

> Official notice, rather than judicial notice, is the proper method by which agency decisionmakers may apply knowledge not included in the record. The Administrative Procedure Act allows a decisionmaker to take "official notice" of material not appearing in the evidence in the record. Official notice is a broader concept than judicial notice. Both doctrines allow adjudicators to take notice of commonly acknowledged facts, but official notice also allows an administrative agency to take notice of technical or scientific facts that are within the agency's area of expertise.

*Id.* at 93 n.4. Here, however, the Immigration Judge did not expressly invoke the doctrine of official or administrative notice in evaluating Zubeda's claim.[19]

The likelihood of official detention greatly bolsters Zubeda's claim under the Convention given the apparent likelihood that she would be raped if detained. Although we conclude that the BIA erred in providing only a minimal analysis of Zubeda's claim and deciding the appeal on the basis of *Matter of J-E*, as well as allowing rulings on her asylum and withholding of deportation claim to control her claim under the Convention, we are reluctant to simply reverse and remand to the BIA given the ambiguity surrounding the Immigration Judge's possible invocation of the doctrine of administrative notice.

Moreover, counsel for the INS has conceded that, given the state of this record, the matter can best be resolved by a remand to the Immigration Judge (as opposed to the BIA) to allow clarification of the record and an opportunity for

---

19. We do not suggest that an Immigration of Administrative Judge must always formally announce that he or she is taking administrative notice.

any additional fact finding or evidence that may be necessary. *See INS v. Ventura*, 537 U.S. 12 (2002). Accordingly, we will remand the matter to the Immigration Judge for further proceedings consistent with this opinion. In doing so, we commend counsel for the INS for the fair, forceful and thorough manner in which she presented the government's appeal. The government has no interest in deporting Zubeda if she is entitled to relief from the order of deportation.

> In light of the universal condemnation of torture in numerous international agreements, and the renunciation of torture as an instrument of official policy by virtually all of the nations of the world (in principle if not in practice), . . . . an act of torture committed by a state official against one held in detention violates established norms of the international law of human rights, and hence the law of nations.

*Filartiga v. Pena-Irala,* 630 F.2d 876, 880 (2nd Cir. 1980).[20]

The INS has also agreed that Zubeda will be able to raise the issue of her tribal identity before the Immigration Judge on remand. The administrative record confirms that Zubeda is a member of the Bembe tribe. Form 1-870 (record of determination of credible fear interview), at 2. (A.R. at 296). Zubeda's counsel claimed at oral argument that she is also entitled to relief because of treatment afforded Bembes in the DRC. The Bembe tribe is from the South Kivu Region of the DRC which is a rebel-held and controlled area of the Congo. According to Amnesty International, a number of people who live in the Kivu Region are being detained by the DRC and are at risk of being tortured. App. at 95. Moreover, Amnesty International reports that a number of these individuals are being arbitrarily detained simply because they are from the Kivu Region. *Id.* Amnesty

---

20. *See also* Universal Declaration of Human Rights, General Assembly Resolution, 217(III)(A)(Dec. 10, 1948) ("no one shall be subjected to torture"), American Convention on Human Rights, Art. 5, OAS Treaty Series No. 36 at 1, OAS Off. Rec. OEA/Ser 4 v/II 23, doc 21, rev.2. (English ed. 1975) ("No one shall be subjected to torture or to cruel, inhuman or degrading punishment or treatment").

International indicates that members of the Bembe tribe are generally opposed to the killing of the Tutsi minority in the Congo. App. at 82. Zubeda's counsel claims that the government of the DRC regards Bembes as sworn enemies of the government. Counsel also notes that, according to Amnesty International, mayi-mayi, who are armed groups supporting the government, have targeted Bembes for killing. App. at 82. In Zubeda's counsel's view, this strongly supports her claim that she is more likely to be tortured if returned to the Congo. It may also provide the missing "on account of" element for a claim of asylum or withholding of deportation.

However, counsel concedes that this issue was not raised by prior counsel before the Immigration Judge.[21] Nevertheless, inasmuch as the INS has agreed to allow Zubeda to raise this issue on remand, the Immigration Judge will be able to determine if Zubeda's ethnicity affects the prior denial of relief. As we have previously noted:

> Justice requires that an applicant for asylum or withholding of deportation be afforded a meaningful opportunity to establish his or her claim. Deportation is always a harsh measure; it is all the more replete with danger when the alien makes a claim that he or she will be subject to death or persecution if forced to return to his or her home country. In enacting the Refugee Act of 1980 Congress sought to give the United States sufficient flexibility to respond to situations involving political or religious dissidents and detainees throughout the world.

*Senathirajah*, 157 F.3d 210, 221 (3d Cir. 1998) (internal quotation marks omitted) (quoting *INS v. Cardoza-Fonseca,* 480 U.S. 421, 449 (1987)).

## IV.   CONCLUSION

Accordingly, for the reasons set forth above, we will vacate the decision of the BIA and remand to the

---

21. Zubeda's current counsel did not represent her when she appeared for the evidentiary hearing before the Immigration Judge.

Immigration Judge for proceedings consistent with this opinion.

A True Copy:
         Teste:

                    *Clerk of the United States Court of Appeals*
                         *for the Third Circuit*