

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-29-2004

# Qorraj v. Atty Gen USA

Precedential or Non-Precedential: Non-Precedential

Docket No. 02-4099

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Qorraj v. Atty Gen USA" (2004). *2004 Decisions.* Paper 1063.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/1063

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 02-4099

PELLUMB QORRAJ,
Petitioner

v.

JOHN ASHCROFT,
ATTORNEY GENERAL OF THE
UNITED STATES OF AMERICA,
Respondent

On Petition for Review of an Order of the
Immigration and Naturalization Service
Board of Immigration Appeals
(BIA No. A76-119-991)

Argued July 31, 2003

Before:  SCIRICA, Chief Judge, RENDELL and AMBRO, Circuit Judges.

(Filed: January 29, 2004)

Kimberly A. Rudolph      [ARGUED]
Gay, Chacker & Mittin
1731 Spring Garden Street
Philadelphia, PA  19130

Jewls C. Rogowska
3718 Spring Garden Street
Philadelphia, PA  19104
*Counsel for Petitioner*

Michael P. Lindemann
Linda S. Wernery
Douglas E. Ginsburg
John D. Williams          [ARGUED]
U. S. Department of Justice
Office of Immigration Litigation
P.O. Box 878
Ben Franklin Station
Washington, DC  20044
*Counsel for Respondent*

---

OPINION OF THE COURT

---

RENDELL, Circuit Judge.

Pellumb Qorraj petitions the court for review of the Attorney General's denial of his claims for relief from removal.  Our jurisdiction arises under 8 U.S.C. § 1252(a).  We will deny the petition for review.

## I.

Qorraj, a native of Albania, entered the country as a nonimmigrant with authorization to remain in the country until December 19, 1998.  When he remained beyond that time, he was placed in removal proceedings.  He conceded deportability, but claimed that he was eligible for asylum, withholding of departure, and relief under the Convention Against Torture (CAT) because of persecution on account of his political opinion.  At his hearing before the Immigration Judge (IJ), Qorraj testified that the

2

persecution he alleged stemmed directly from his service in the Albanian army. Qorraj was a member of the army since 1982, having received his first rank in 1992. At the time of his hearing, he was a chief of a battalion in the army – holding the rank of captain – and was 37 years old. He was the only person who testified at the hearing.

The series of events that he alleged in support of his claims for relief began in October, 1996, at a time when Albania was in domestic upheaval. According to Qorraj, a secret service officer who was a very close relative to a deputy of the Democratic Party – the party in power at the time – threatened him that, if he continued to vocalize the fact that he "did not like the politics" of the army, he would be discharged from the army and put in prison. Qorraj testified that he had "openly and courageously" shared his opinion that "the military should be free of politics."

Qorraj further testified to various incidents more directly related to his service in the army. The first of these occurred on Feb. 19, 1997. That day, while Qorraj was carrying out a major's order to protect the office of the mayor of Tirane, the Albanian capital, he was given orders to shoot to kill anyone approaching either the mayor's office or the ministry of education. Because he believed that military regulations did not allow him to shoot citizens, he requested that the major put this order in writing. The major refused and reported Qorraj's request to his supervising general. Later that day, Qorraj was arrested by army policemen and was imprisoned for five days because his superiors deemed him, as Qorraj put it, to be an "undisciplined member of the army."

3

After his release and a stint in the hospital due to weakness resulting from the incarceration, Qorraj returned to work. A major, however, told him to go home and placed Qorraj on leave. Qorraj believed that he was put on leave as a first step to discharging him from the army. Nonetheless, he returned to command his battalion.

On March 5, 1997, Qorraj's battalion was ordered to go from its permanent location in Tirane to Vlora "to crush the demonstrations" that had been taking place for many days in the southern part of Albania. The demonstrations were led by members of the Socialist Party. The description that Qorraj gave of the demonstrations makes them out to be more like riots. Qorraj's battalion was ordered to protect a certain area of the city and to shoot to kill anyone who approached that area. Qorraj obeyed the order to go to the area, but refused to order his men to kill anyone. When the demonstrators began to shoot at his battalion, Qorraj ordered the men to shoot around (not at) the citizens in order to scare them off. On March 11, 1997, more troops were brought in to fortify Qorraj's battalion. Qorraj seeing that it "was going to turn into a massive attack against the protestors," ordered that his troops withdraw. Qorraj told some army officers that he was withdrawing because a massive attack would go against military regulations. As his battalion withdrew, those army officers fired upon it, but no one was killed.

Qorraj took his battalion to the town of Fier. There, the men asked for vehicles to get to Tirane. Their requests were initially rebuffed. Eventually, though, the army did get them vehicles, either, it appears, "because . . . they felt kind of obligated," or "because

4

they were scared of what could happen" if they decided otherwise.  While at Fier, Qorraj was told by a general to return to Vlora or the whole battalion would be imprisoned for the rest of their lives.  Qorraj still refused.  Eventually, other divisions joined Qorraj's troops in refusing to fight.

On March 12, 1997, the battalion returned to Tirane.  Qorraj testified that the battalion's base was attacked by civilians, secret police, and representatives of the Democratic Party.  But a major refused to grant the battalion permission to use weapons against the civilians.  The soldiers soon fled as the civilians stole their weapons and supplies.

In June, 1997, Qorraj participated in discussions in Tirane as to what the military should do in the newly stabilized country.  He gave a speech to about 65-70 military personnel conveying his belief that the army was too much of a political tool and should not be used to further the ends of politicians.  After the meeting, Qorraj received two "threats" – which, based on Qorraj's description, really were attacks.  One of the "threats" involved men shooting into his house.  He assumed that the men were Democrats because they were calling him a traitor.  The second "threat" occurred on July 8, 1997.  The network through which the electricity to Qorraj's family's home ran was destroyed.  The people who did it were cursing at him and his family.  He believed, without supporting evidence, that the people were members of the Democratic Party.

Qorraj's family fled to Skrapar, and Qorraj "went into hiding."  He soon took a test

at the U.S. embassy to see if he was eligible for a U.S.-sponsored advanced training course in tanks at Fort Knox, Kentucky. He passed the test. He testified that he and the chief of human resources of his brigade decided to keep his participation a secret, but later testified that he was threatened at the airport that if he ever returned he would have trouble, and that he thought members of the government knew of his participation. In any event, Qorraj left Albania for the U.S. on April 13, 1998. His training ended Dec. 16 or 17, 1998. Although he testified that he had not intended to stay in the U.S. permanently, he decided to remain in the U.S. after learning from his parents that people in Albania were asking about him.

Qorraj also testified that the Democratic Party is no longer in power, and that the Socialists have come into power. Qorraj claimed to have problems with the Socialists, but did not specify what exactly. Although he was never court-martialed and was never demoted in rank, his position was lowered.

## II.

The basic law underlying this petition is clear. The Attorney General, in his discretion, may grant asylum to Qorraj if he meets the definition of "refugee" as defined in the Act, *i.e.*, an alien who is unable or unwilling to return to his home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. §

6

1101(a)(42)(A). To qualify for withholding of removal, on the other hand, Qorraj must show that, if deported, there is a "clear probability" – that is, it is "more likely than not" – that he will be persecuted on account of a specified ground – here, political opinion – if returned to his native country. See Zubeda v. Ashcroft, 333 F.3d 463, 469 (3d Cir. 2003). If Qorraj "fails to establish the well-founded fear of persecution required for a grant of asylum, he . . . will, by definition, have failed to establish the clear probability of persecution required for withholding of deportation." Id. at 469-70. To qualify for relief under the Convention Against Torture, 1465 U.N.T.S. 85, 23 I.L.M. 1027 (1984), Qorraj must prove that he is more likely than not to be tortured in Albania (the country of removal). See Abdulrahman v. Ashcroft, 330 F.3d 587, 592 (3d Cir. 2003) (citing 8 C.F.R. §§ 208.16(c)(2) & (4))

The Immigration Judge made clear his disbelief as to most of what Qorraj testified to, noting that he found it "incredible" that Qorraj would disobey a major's orders and that Qorraj would refuse to fire on civilians that were firing on him. The IJ noted two parts of Qorraj's testimony that were contradictory: whether the military gave him vehicles for his battalion at Tirane, and whether anyone other than a major knew that he was attending tank school.

The IJ also noted the lack of proof of persecution. Qorraj refused to carry out military orders, but was only minimally punished for this, and, in fact, was allowed to remain a part of the army. The IJ found no evidence linking the two "threats" on Qorraj's

7

home to the government or the Democratic Party. According to the IJ, Qorraj did not articulate a sufficient basis for his belief. Moreover, the IJ concluded that any persecution that Qorraj suffered was not due to his political opinion, but, rather, due to his failure to comply with the orders of his superiors. As for the threats that his parents relayed to Qorraj while he was in the U.S., the IJ found that they also were more likely the result of his desertion of his duty than his alleged political opinion.

The BIA affirmed without opinion under 8 C.F.R. § 3.1(a)(7) (2002). Qorraj's request for voluntary departure, however, was granted.

Where, as here, the BIA affirms without opinion, we review the IJ's decision to address substantive challenges. Gao v. Ashcroft, 299 F.3d 266, 271 (3d Cir. 2002). We initially review the administrative findings of fact for substantial evidence. INS v. Elias-Zacarias, 502 U.S. 478, 481 (1992). We will only reverse if "any reasonable adjudicator will be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); see also Elias-Zacarias, 502 U.S. at 481 n.1.

Importantly, Qorraj does not take issue with the IJ's finding that Qorraj testified inconsistently as to the two specified aspects of his story. Instead, his basic argument is that the IJ should have found that he was – or has a "well founded fear" that he will be – persecuted on account of his political opinion. He also argues that there was a presumption of future persecution based on his past persecution that the Government never rebutted. Although he has articulated his alleged political opinion in various ways,

8

it seems that it was best represented at oral argument as being that he was opposed to the army's practice of shooting at innocent civilians. Given our ruling, we need not decide whether this qualified as a "political opinion," but will assume so for purposes of our analysis.[1]

As the Supreme Court has made clear, Qorraj "must establish that he was a 'well-founded fear' that [he] will [be] persecuted . . . *because of* that political opinion" in order to establish eligibility for asylum. Elias-Zacarias, 502 U.S. at 483 (emphasis in original). Qorraj has not convinced us that the IJ's determination that Qorraj failed to show that he was persecuted because of that political opinion was not supported by substantial evidence. Qorraj himself testified that the problems he allegedly suffered did not come as a result of his voicing opposition to the military policies, but, rather, as a result of his refusal to carry out those policies, which, in the context, amounted to a refusal to do his job or carry out orders. In addition, Qorraj has not demonstrated to us that the IJ's determination that he did not have a "well-founded fear" that he will be persecuted because of his political belief was not based on substantial evidence. As the IJ pointed out, there is no evidence other than Qorraj's surmise that the people who attacked his home were from the Democratic Party. Even if there was such evidence, it would not support his claims because it would not satisfy the requirement that he show that the

---

[1] Our court has interpreted the concept of "political opinion" broadly. See, e.g., Fatin v. I.N.S., 12 F.3d 1233, 1242 (3d Cir. 1993) ("[W]e have little doubt that feminism qualifies as a political opinion within the meaning of the relevant statutes.").

9

complained-of persecution was at the hands of government actors or forces the government is unable or unwilling to control. See Baballah v. Aschcroft, 335 F.3d 981, 987 (9th Cir. 2003). As Qorraj testified, the Democratic Party is no longer in power, but, rather, the Socialists are. And, other than his brief testimony that he has some problems with the Socialists, there is no evidence in the record that the Socialists would persecute him. Moreover, we believe that the paucity of supporting testimony and documentation is compounded by the IJ's credibility concerns. See Abdulrahman, 330 F.3d at 597; see also Gao, 299 F.3d at 272 ("Aliens have the burden of supporting their asylum claims through credible testimony.").

We therefore will not disturb the IJ's finding that Qorraj did not qualify for asylum, and, *a fortiori*, his refusal to grant Qorraj withholding of removal. See Zubeda, 333 F.3d at 469-70. For the same reasons, we cannot conclude that substantial evidence did not support the IJ's determination that Qorraj did not qualify for relief under CAT. There was substantial evidence in the record for the IJ to conclude that Qorraj was not "more likely than not" to be tortured if he returns to Albania.

## III.

Qorraj also levels an attack against the streamlining review procedure of the BIA under 8 C.F.R. § 3.1(a)(7)(2002). He argues that it is unconstitutional because it violates procedural due process protections guaranteed by the Fifth Amendment. See U.S. Const.

amend. V. However, as we recently concluded, "the streamlining regulations do not violate the Due Process Clause of the Constitution." Dia v. Ashcroft, 2003 WL 22998113, at *5 (3d Cir. Dec. 22, 2003). Thus, we reject Qorraj's challenge.

Accordingly, the petition for review will be denied.

_____

/s/ Marjorie O. Rendell
Circuit Judge