Aysar **ABDULRAHMAN**, Petitioner

v.

John **ASHCROFT**, Attorney General of the United States, Respondent

No. 02–2513.

United States Court of Appeals, Third Circuit.

Argued Feb. 25, 2003.

Opinion filed: May 21, 2003.

Kai W. De Graaf (Argued), New York, NY, for Petitioner.

Robert D. McCallum, Assistant Attorney General, United States Department of Justice Civil Division, Alison R. Drucker, Senior Litigation Counsel, Office of Immigration Litigation, Alison Marie Igoe (Argued), Office of Immigration Litigation, Washington, DC, for Respondent.

Before: BECKER, Chief Circuit Judge * and SCIRICA, Circuit Judge ** SHADUR,*** District Judge.

* Judge Becker completed his term as Chief Judge on May 4, 2003.

** Judge Scirica began his term as Chief Judge on May 4, 2003.

*** Honorable Milton I. Shadur, United States District Court Judge for the Northern District of Illinois, sitting by designation.

## OPINION OF THE COURT

SHADUR, District Judge.

Aysar Abdulrahman ("Abdulrahman") is a married citizen and native of the Sudan who entered the United States on August 23, 2001 without valid documents and requested political asylum. Although the Immigration and Naturalization Service ("INS") determined that Abdulrahman had a credible fear of persecution, it initiated removal proceedings, charging Abdulrahman under 8 U.S.C. § 1182(a)(7)(A)(i)(1)[1] with being inadmissible to the United States and referring him to an immigration judge ("IJ") for a hearing. Abdulrahman responded by filing an application for political asylum and withholding of removal and requesting relief under the Convention Against Torture.

On December 17, 2002 the IJ denied Abdulrahman's applications, finding that he had failed to establish that he was eligible for relief. Abdulrahman appealed that decision to the Board of Immigration Appeals ("Board" or "BIA"). Dismissing Abdulrahman's appeal, the Board deferred to the IJ's adverse credibility determination and affirmed her decision as supported by the record. This petition for review followed. We deny the petition.

### Administrative and Judicial Standards

As *Abdulai v. Ashcroft*, 239 F.3d 542, 549 (3d Cir.2001) has made clear, a decision by the Board that an applicant is ineligible for asylum constitutes a "final order of removal" that may be subject to judicial review under Section 1252(a)(1). But where as here the Board has deferred to the IJ's decision rather than rendering its own opinion, "a reviewing court must, as a matter of logic, review the IJ's decision to assess whether the BIA's decision to defer was appropriate" (*id.* at 549 n. 2; *Chen Yun Gao v. Ashcroft*, 299 F.3d 266, 271 (3d Cir.2002)). That review is extremely narrow in scope. Because Congress has delegated authority over the immigration laws to the Attorney General, who in turn vested that authority in the Board, principles of *Chevron* deference apply in the immigration context (*Chen Yun Gao*, 299 F.3d at 271, citing *INS v. Aguirre–Aguirre*, 526 U.S. 415, 424, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999)). *Aguirre–Aguirre, id.* at 425, 119 S.Ct. 1439 further noted that implications for foreign policy make judicial deference "especially appropriate in the immigration context."

Pursuant to Sections 1158(a)(1) and 1158(b)(1), the Attorney General may grant asylum[2] to an otherwise removable alien who demonstrates that he or she meets the definition of "refugee" in Section 1101(a)(42)(A): a person unable or unwilling to return to his or her country of origin "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opin-

---

1. Further citations to Title 8 provisions will take the form "Section—," referring to the Title 8 section numbering rather than to the internal numbering of the immigration laws.

2. In addition to political asylum, Abdulrahman sought withholding of removal and relief under the Convention Against Torture, both of which require the applicant to make a more stringent showing to qualify for relief. To qualify for withholding of removal, previously called withholding of deportation, an applicant must show that there is a "clear proba-

bility" that he or she would face persecution if returned to his or her home country (*Li Wu Lin v. INS*, 238 F.3d 239, 244 (3d Cir.2001)). Relief under the Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, 1465 U.N.T.S. 85, 23 I.L.M. 1027 (1984), requires that an alien must prove that he or she is more likely than not to be tortured in the country of removal (8 C.F.R. §§ 208.16(c)(2) and (4)). Further citations to C.F.R. provisions will take the form "Reg. § —," omitting the 8 C.F.R. preface.

ion." As *Chen Yun Gao,* 299 F.3d at 272 has outlined, quoting *Navas v. INS,* 217 F.3d 646, 655 (9th Cir.2000):

> In order to establish eligibility for asylum on the basis of past persecution, an applicant must show "(1) an incident, or incidents, that rise to the level of persecution; (2) that is 'on account of' one of the statutorily-protected grounds; and (3) is committed by the government or forces the government is either 'unable or unwilling' to control."

Such a showing of past persecution raises a presumption of a well-founded fear of future persecution (Reg. § 208.13(b)(1)).[3] Where past persecution is not established, "[a]n applicant can demonstrate that she has a well-founded fear of future persecution by showing that she has a genuine fear, and that a reasonable person in her circumstances would fear persecution if returned to her native country" (*Chen Yun Gao,* 299 F.3d at 272).

 Under those provisions, aliens have the burden to establish their eligibility for asylum through credible testimony (*Chen Yun Gao,* 299 F.3d at 272, citing *Abdille v. Ashcroft,* 242 F.3d 477, 482 (3d Cir.2001)). While aliens are not required to show that persecution is "more likely than not," they must show "a subjective fear of persecution that is supported by objective evidence that persecution is a reasonable possibility" (*Fengchu Chang v. INS,* 119 F.3d 1055, 1066 (3d Cir.1997)). Testimony alone may be sufficient to meet that burden—again so long as it is credible (*Chen Yun Gao,* 299 F.3d at 272).

### Background

Most of the evidence at his removal hearing came from the testimony of Abdulrahman himself. Unless otherwise indicated, what follows is drawn from that source, although as explained later the IJ did not credit Abdulrahman's account.

Born in 1970 in the southern portion of the Sudan, Abdulrahman is of Dinghy blood, a subset of the Shilluk tribe. In 1987 he joined the Southern Student Union while in high school because "[a]ll those from the south" joined that organization. As secretary of the Student Union, Abdulrahman arranged meetings, recruited members, distributed fliers and educated new members about the group's objectives. After graduating Abdulrahman continued his membership in the Student Union, helping to train new members by teaching them how to organize and by leading discussions.

On three occasions over a period of three years Abdulrahman was arrested because of his membership in the Student Union. First, he was arrested in March 1999 while preparing fliers at a meeting, when 12 armed security agents took him and five other Student Union members to the "Ghost House." There he was detained in an isolated dark room for two weeks. Although he was given food and a small cup of water twice a day, he was verbally assaulted, beaten daily with sticks and whips and questioned about his Student Union activities. Before the agents released him, they forced him to agree in writing to abandon his political activities. Upon his release, Abdulrahman returned home. During the hearing Abdulrahman amended his initial testimony that he sought treatment at a hospital, stating that he was treated at home with herbal medicines that his family members had obtained from the hospital.

---

**3.** That presumption can be rebutted if the INS establishes by a preponderance of the evidence that the applicant could reasonably avoid persecution by relocating to another part of his or her country or that conditions in the applicant's country have changed so as to make his or her fear no longer reasonable (Reg. §§ 208.13(b)(1)(i) and (ii)).

Roughly one year later, on the night of March 10, 2000, eight security agents arrested Abdulrahman for the second time, taking him from his home to a security office in Birahi. There he was interrogated for two days and again subjected to torture before being transferred to Khobra Prison, where he remained for a month. While in prison he was interrogated about his political activities, verbally assaulted and beaten with a whip. Once again, before his release he was forced to sign a statement promising to refrain from political activity.

At about 1:00 a.m. on March 3, 2001 security agents came to Abdulrahman's house and arrested him for the third time, once more taking him to the "Ghost House." He believes he was arrested because his name was on a list of Student Union members that had been taken from a student meeting broken up by security officers earlier that evening. Abdulrahman was interrogated and detained for one month, during which he was beaten, whipped and electrically shocked all over his body. His captors pointed out that this was his third arrest and threatened that if he was arrested again they would "liquidate" him. Before he was released he was again made to agree in writing to desist from political activities.

Ten days after his release Abdulrahman attended a public celebration that was halted by police. Abdulrahman returned home and later that day learned that one of his friends in the Student Union was missing. Fearing that he would be arrested again, he fled to Mayo where he stayed for two months. After discussing his situation with his friends in the Student Union, Abdulrahman decided to flee the Sudan. He obtained a certificate of citizenship from the Sudanese government, procured false travel documents and left the Sudan on August 18, 2001.

Although Abdulrahman had stated in his initial airport interview that he did not have any family in the United States, his uncle Hafiz Suliman ("Suliman") also testified at the removal hearing on his behalf. Suliman, who fled the Sudan in 1996 and had been granted political asylum in the United States, testified that at the United States Embassy in the Sudan an applicant will be denied a visa if he mentions the existence of relatives in the United States. Suliman further testified that although he had heard from Abdulrahman's mother that his nephew was having problems in the Sudan, he did not know the nature of those problems and did not have any personal knowledge of Abdulrahman's activities with the Student Union. Suliman also stated that he did not know that his nephew was coming to the United States or that Abdulrahman had traveled to the United States under his uncle's name.

Abdulrahman did not produce any documentation of his membership in the Student Union, explaining that he was afraid to carry such documents himself and that his contacts in the Sudan could not do so for fear of government surveillance. He did submit documentary reports and articles that described the conditions in the Sudan. Those reports detail the Sudan's poor record on human rights and the long-standing ethnic and religious conflicts between the northern and southern Sudanese people. Although there was a record of Sudanese security forces intimidating and harassing students who opposed the government, the reports made no mention of the Student Union.

After reviewing Abdulrahman's testimony and documentary evidence, the IJ concluded that Abdulrahman was not credible because his testimony was insufficiently detailed, internally inconsistent and illogical. She found that his testimony regarding his involvement with the Student Un-

ion was too general to support his claim. Even apart from the lack of evidence of his membership in the group, Abdulrahman had never specifically explained the organization's political goals, its internal structure or how he became its secretary. In addition the IJ observed that while Abdulrahman's only explanation for his arrests was his membership in the Student Union, he had failed to explain why he in particular was targeted for harsher treatment than other members of the group. Because there was no specific testimony or other evidence of Abdulrahman's political involvement or activities other than membership in the Student Union, as well as no specific explanation of how those activities led to his arrests, the IJ found no basis for concluding that his testimony about the arrests was credible.

In addition to such lack of specificity, the IJ questioned the logic and consistency of Abdulrahman's claims. She noted that although he claimed to have been tortured approximately five months before arriving in the United States, he bore no physical evidence of mistreatment. Further, she found that his failure to obtain medical treatment for his injuries at a hospital was not explained by his testimony that the herbal medicine he obtained through his family members was common practice in the Sudan. She also found that Abdulrahman's ability to obtain a certificate of citizenship from the Sudanese government in August 2001 was inconsistent with his testimony that he was in hiding from the government and could not obtain travel documents or documentation of his membership in the Student Union.

Even though conceding that the human rights situation in the Sudan was dismal, the IJ was not persuaded by Abdulrahman's testimony that he had been politically active in the Sudan or suffered the claimed harms. She further found that Suliman's testimony was also not credible, as even his relationship to Abdulrahman remained questionable. In summary, the IJ concluded that Abdulrahman was ineligible for relief because he had not met his burden of proving past persecution and had not provided sufficient evidence that he had a well-founded fear of future persecution.

Abdulrahman appealed that decision to the Board, arguing that the IJ erred in her credibility determination and that her findings were not substantially supported by the evidence. Deferring to the IJ and affirming her ruling, the Board concluded that she had adequately stated the basis for her adverse credibility determination and that she had correctly concluded that Abdulrahman had not met his burden of proof. Abdulrahman timely petitioned this Court for review of the Board's decision.

### Application of the Relevant Standards

Abdulrahman argues that the Board erred in affirming the IJ's ruling for three reasons: (1) the IJ applied the wrong burden of proof standard to his asylum application, (2) the IJ impermissibly acted as a witness rather than an impartial arbiter and (3) the IJ's findings were not based on substantial evidence. We address each argument in turn.

### Burden of Proof

First, Abdulrahman argues that the IJ erroneously applied the more stringent "more likely than not" standard, applicable to withholding of removal, to his asylum claim that he suffered past persecution. But because Abdulrahman failed to raise that issue in his appeal to the Board, we do not have jurisdiction to consider the question. Section 1252(d)(1) provides for judicial review of final orders of removal "only if . . . the alien has exhausted all administrative remedies available to the alien as of right." Thus an alien is

required to raise and exhaust his or her remedies as to each claim or ground for relief if he or she is to preserve the right of judicial review of that claim (*Alleyne v. INS*, 879 F.2d 1177, 1182 (3d Cir.1989), concluding that Section 1105(a)(c) (the predecessor to the current provision) "bars consideration of particular questions not raised in an appeal to the Board").

Although Abdulrahman attempts to argue that the burden of proof issue was raised in his notice of appeal and written brief to the Board, those efforts are in vain. Even when those documents are viewed expansively, nothing there even suggests the issue of the IJ's asserted application of the incorrect standard. Abdulrahman's appeal to the Board argued two basic propositions: (1) that the IJ erred in finding that Abdulrahman was not credible and (2) that the IJ's findings were not supported by substantial evidence. Although Abdulrahman did assert (**R. 14, 42–43, 44**) that the IJ "erred as a matter of law and discretion," that generalized claim did not alert the Board to the issue he seeks to raise for the first time here.[4]

Abdulrahman alternatively argues that imposition of the exhaustion requirement should be waived, citing *Grant v. Zemski*, 54 F.Supp.2d 437, 441–42 (E.D.Pa.1999).

But quite apart from the nonprecedential force of District Court opinions, *Grant, id.* at 441 n. 5 expressly distinguished the issue in that case—whether a failure to exhaust would preclude review of an INS decision to keep the petitioner in custody during his removal proceedings—from the unequivocal statutory mandate at issue here, which expressly requires exhaustion for review of removal decisions. And *McCarthy v. Madigan*, 503 U.S. 140, 144, 112 S.Ct. 1081, 117 L.Ed.2d 291 (1992), also sought to be relied upon by Abdulrahman, made clear that "[w]here Congress specifically mandates, exhaustion is required." Although Abdulrahman, like the petitioner in *Grant*, has been detained, he cites no authority for our overriding the exhaustion requirement mandated by Section 1252(d)(1). Because Abdulrahman could have raised the wrong-standard issue before the Board and failed to do so, review on that ground has been foreclosed.

### IJ Bias

Second, Abdulrahman contends that the IJ improperly acted as a witness at the removal hearing, conducting the proceedings in a biased manner that violated his due process rights.[5] We review de novo whether Abdulrahman's due

---

4. Even if Abdulrahman had posed the issue to the Board, it is hardly persuasive. Following a recitation of the facts of the case, the IJ outlined the applicable law, correctly stating the standard for determining whether Abdulrahman had produced sufficient evidence to establish his eligibility for asylum. Abdulrahman relies instead on the IJ's comment in the context of her credibility determination, in which she concluded that it was more likely than not that Abdulrahman was not telling the truth. That determination was independent of her conclusion that Abdulrahman had failed to meet his burden of proof that he was eligible for relief. Read as a whole, the IJ's decision properly states and applies the law of asylum.

5. Here the government contends that Abdulrahman failed to exhaust this issue as well, so that we are also foreclosed from reviewing his due process argument. Although grounded in procedural due process, a claim of IJ bias remains subject to administrative exhaustion requirements mandating that the issue be raised before the Board (*see Sanchez–Cruz v. INS*, 255 F.3d 775, 780 (9th Cir.2001)). While Abdulrahman's appeal to the Board did not frame the matter in due process terms in so many words, both his notice of appeal and his later brief to the Board argued that the IJ impermissibly based her decision on her own speculative beliefs rather than on the evidence. As such, he adequately alerted the Board to the issue, thus preserving it for our review.

process rights were violated (*Lee Moi Chong v. INS*, 264 F.3d 378, 386 (3d Cir. 2001)).

▅▅▅▅ *Abdulai*, 239 F.3d at 549 confirmed an obvious truth: "Despite the fact that there is no constitutional right to asylum, aliens facing removal are entitled to due process." In the context of an immigration hearing, due process requires that "aliens threatened with deportation are provided the right to a full and fair hearing" that allows them "a reasonable opportunity to present evidence" on their behalf (*Sanchez–Cruz*, 255 F.3d at 779 (internal quotation marks omitted)). And as *Schweiker v. McClure*, 456 U.S. 188, 195, 102 S.Ct. 1665, 72 L.Ed.2d 1 (1982) recognized, it is well established that "due process demands impartiality on the part of those who function in judicial or quasi-judicial capacities" (*see also Marincas v. Lewis*, 92 F.3d 195, 204 (3d Cir.1996), describing the need for a neutral judge as one of the most basic due process protections). As judicial officers, IJs have a "responsibility to function as neutral and impartial arbiters" and "must assiduously refrain from becoming advocates for either party" (*Aguilar–Solis v. INS*, 168 F.3d 565, 569 (1st Cir.1999)).

▅▅▅ Abdulrahman does not cite specifically to the transcript of his removal hearing to support his allegation of bias, nor does he directly challenge any of the IJ's statements or conduct during that proceeding. Instead he points generally to the IJ's comments in her opinion about the availability of hospitals in the Sudan, about the time required for scars to heal and about the structure and functioning of the Sudanese government offices that issue birth certificates and travel documents, contending that in each of those instances the IJ based her conclusions on her own speculative beliefs rather than on evidence in the record. From those things he concludes that the IJ "clearly conducted the underlying proceedings in a manner that was fundamentally unfair, partial, and prejudicial."

Abdulrahman's allegation that the IJ acted as a witness against him is unfounded. In the hearing transcript the IJ made no statements expressing her own opinions as to Sudanese medical practices or Abdulrahman's lack of scarring, or as to the issuance of official Sudanese documents. Instead, in evaluating his credibility and issuing her ruling, the IJ questioned the logic of Abdulrahman's factual assertions on those matters. Such an assessment is not improper for a trier of fact and does not amount to acting as a witness. Indeed, that type of evaluation is integral to the weighing of testimony and evidence that is typically required to make a credibility determination. As the late great Judge Jerome Frank once put it (*In re J.P. Linahan, Inc.*, 138 F.2d 650, 654 (2nd Cir.1943)):

> Impartiality is not gullibility. Disinterestedness does not mean child-like innocence. If the judge did not form judgments of the actors in those court-house dramas called trials, he could never render decisions.

That said, however, it must be added that there were places where the IJ did go beyond the bounds of propriety to make some additional and problematic generalized assertions of her own. While as discussed below we are understandably troubled by some of those comments, in the context of the record as a whole there is insufficient evidence to conclude that the overall proceedings were biased in violation of Abdulrahman's right to due process.

Thus the IJ did not unreasonably impose restrictions on Abdulrahman's presentation of either testimonial or documentary evidence, instead affording him the opportunity to testify fully. While he was

on the stand she did not obstruct or denigrate his testimony. In fact, she interjected only to allow him to clarify inconsistent responses or to give him the opportunity to respond in further detail. Although the language used by the IJ during the hearing and in her opinion does reflect an annoyance and dissatisfaction with Abdulrahman's testimony that is far from commendable, such a lack of courtesy and the absence of the expected level of professionalism do not rise (or, more accurately, fall) to a violation of due process (*Aguilar–Solis,* 168 F.3d at 569, citing *Liteky v. United States,* 510 U.S. 540, 555–56, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994)).

### Substantiality of the Evidence

■ Finally Abdulrahman contends that the IJ's adverse credibility determination was not based on substantial evidence in the record. We review the IJ's factual determination of an alien's eligibility for asylum under the substantial evidence standard (*Chen Yun Gao,* 299 F.3d at 272). Findings of fact by the IJ, including adverse credibility determinations, will be upheld to the extent that they are "supported by reasonable, substantial, and probative evidence on the record considered as a whole" (*id.*). *INS v. Elias–Zacarias,* 502 U.S. 478, 481 n. 1, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992) has set a high hurdle by permitting the reversal of factual findings only when the record evidence would "*compel*" (emphasis in original) a reasonable factfinder to make a contrary determination.

■ Implementing the *Elias–Zacarias* standard, *Chen Yun Gao,* 299 F.3d at 272 and 276 has explained that although adverse credibility determinations cannot be based on speculation or conjecture, such a finding will be afforded substantial deference where it is grounded in evidence in the record and where the IJ provides specific cogent reasons for her determination.

As *Sarvia–Quintanilla v. INS,* 767 F.2d 1387, 1395 (9th Cir.1985) had earlier cautioned:

> An immigration judge alone is in a position to observe an alien's tone and demeanor, to explore inconsistencies in testimony, and to apply workable and consistent standards in the evaluation of testimonial evidence. He is, by virtue of his acquired skill, uniquely qualified to decide whether an alien's testimony has about it the ring of truth. The courts of appeals should be far less confident of their ability to make such important, but often subtle, determinations.

■ Arguing that the IJ's ruling lacked substantial evidence, Abdulrahman charges that the IJ failed to provide specific cogent reasons for her determination that he lacked credibility. He argues that many of the reasons that she provided either were inconsistent with the evidence or were unsupported by anything in the record. We agree that some of the IJ's comments are indeed problematic, but in the end those deficiencies do not call for reversal under the stringent test dictated by *Elias–Zacarias.*

For example, Abdulrahman points out that the IJ discredited his testimony because he assertedly failed to explain why he alone among the members of the Student Union was targeted by security forces. To the contrary, Abdulrahman's testimony was that other members of the Student Union were also harassed and arrested. But the IJ's disbelief that Abdulrahman was singled out is arguably supportable as to his claim that his membership in the Student Union prevented him from obtaining the travel documents necessary to leave the Sudan, but that other members of the Student Union were able to obtain those documents on his behalf. It was reasonable for the IJ to presume that if Abdulrahman could

not obtain such documents, other members of his persecuted group would be likewise unable, and Abdulrahman offered no explanation for their ability to do what he could not.

Abdulrahman also properly challenges the IJ's criticism of Abdulrahman's testimony about the customary use of alternative medicine and the limited availability of hospitals in the Sudan. In disparaging that testimony, the IJ impermissibly commented that "all countries have hospitals and doctors, however [sic] he wish to provide this false information regarding medical institutions in his country, so be it." That statement had no basis whatever in the record and was therefore highly irregular. Although the IJ went on to say that if Abdulrahman had truly been treated with herbal medicine rather than at a hospital, he had offered no evidence to substantiate such treatment, we view that as placing a wholly unrealistic burden on Abdulrahman—what could really have been available to him in the way of confirmatory evidence on that score? That is exemplary of the problematic mindset that the IJ appears to have brought to the case, and though it does not lead us to overturn her decision under the standard of review we must apply, our entire panel shares the views expressed in the concurring opinion in that respect.

In addition the IJ discredited Abdulrahman's explanation that the Sudan's security forces intentionally utilized torture techniques that would not leave scars. Although there was no evidence in the record either way about whether electric shocks or other forms of torture (including beatings) would leave scars and if so how long those scars would take to heal, the IJ found it "highly improbable" that Abdulrahman could have been tortured in March 2001 and yet arrive in August 2001 with no marks on his body or other evidence of physical mistreatment. Again

the IJ's characterization is troubling, but in the end she went on to note her lack of medical expertise and refrained from addressing the matter further.

Along similar lines, the IJ questioned Abdulrahman's testimony that although he was in hiding he was able to obtain an identity document from the Sudanese Bureau of Passports, Immigration, Citizenship and Identification Cards because the office that issued his citizenship certificate was separate from the office that issued travel documents. As Abdulrahman points out, whether or not such documents are in fact issued by separate Sudanese offices was nowhere in evidence. But the IJ did not go so far as to make a finding on the structure of those offices. Rather she expressed her doubt that someone in hiding from the government could so easily obtain a document from the government just days before he was forced to flee the country to avoid being arrested and tortured by that government.

In several instances, then, the IJ fell well short of what we are entitled to expect from judicial officers—her commentary was not confined to the evidence in the record and smacked of impermissible conjecture. While that was clearly improper, it remains true that the IJ engaged in otherwise appropriate adverse credibility determinations.

But the overriding consideration here must be the extraordinarily deferential standard mandated by *Elias–Zacarias.* In those terms we cannot conclude from the evidence as a whole that any reasonable factfinder would be compelled to find that Abdulrahman's testimony was credible. It is certainly true, as also stressed by the IJ, that Abdulrahman's testimony about his political activities in the Sudan and the nature of the Student Union was remarkably generalized. Although he testified that the Student Union was con-

cerned with the human, political and economic rights of the southern Sudanese, he offered no specific details about the organization's activities or objectives. Nor did he identify any specific meetings, rallies or functions organized or attended by the Student Union, even though he had been a member for almost 15 years. Abdulrahman's description of his role as Student Union secretary was similarly lacking in specifics and provided no input about the internal structure or leadership of the organization. Overall he failed totally to explain how his asserted activities with the Student Union brought him to the attention of the security forces and led to his three claimed arrests.

Moreover, the documentary evidence that Abdulrahman did submit did not provide any support to his generalized testimony. Thus he failed to submit any proof of his membership in or involvement with the Student Union, explaining that it was too dangerous for him to have carried or obtained proof of his membership. And despite his claim that all those in the south joined the organization, none of the country reports that he submitted even mentions the Student Union or its place in the Sudan's political landscape. While Abdulrahman's asylum claim was based almost completely on his arrests because of his membership in the Student Union, he provided nothing other than his testimony to establish that the organization even existed. Given the amorphous nature of the evidence in that respect, we cannot quarrel with the IJ's ultimate determination that Abdulrahman's presentation lacked the necessary level of credibility.

On balance, then, we conclude that it was not unreasonable for the IJ to find that Abdulrahman's testimony was insufficiently detailed to support his asylum claim. Hence we cannot hold that the record evidence would compel a determination contrary to that made by the IJ and upheld by the Board.

### Conclusion

Because Abdulrahman failed to raise the issue before the Board as to whether the IJ had applied an excessively stringent standard to his claim for asylum, we are precluded from reviewing his claim on that ground. Next, although we are certainly troubled by some of the comments in the IJ's opinion, we cannot conclude that the proceedings were biased against Abdulrahman such that his due process rights were violated.

Finally, it is distressing that the IJ seems to have failed to adhere to the obligation of every judicial officer to assure not only the fact but also the appearance of justice. Indeed, that obligation is especially important where, as in this class of cases, the determinations of the trier of fact are subjected to particularly narrow appellate scrutiny.

But in the end the dismissal of Abdulrahman's applications was supported by substantial evidence, in that a reasonable factfinder could conclude from the record that Abdulrahman had not met his burden of establishing his eligibility for asylum. Accordingly, his petition for review is DENIED.

BECKER, Circuit Judge, concurring.

The opinion of the Immigration Judge (IJ) is laden with statements such as the following, which I find troubling in terms of their viability as credibility judgments:

(1) "The respondent testified that he was treated with herbs, by his grandmother and mother, and told the Court these are the way things are done in Sudan, people do not go to the hospital as they do here in the Western World. Again, that is not the case, all countries all [sic] have hospitals and doctors, however, he wish

[sic] to provide this false information regarding the medical institution about his country, so be it." [Op. at 596–597] However, based upon available information about the Sudan, the Respondent's contention seems reasonable. At all events, the basis for the IJ's conclusion seems far from clear; rather, it seems quite tenuous.

(2) "I notice in his asylum application he conveniently stated that fortunately, all of his beatings left him without scars. If respondent was beaten as much as he was beaten on March 3, 2001, given he left his country in August 2001, it's highly improbable that all of his scars would have been healed by the time his asylum application was prepared and submitted to the Court. As I am not a medical physician, the Court will not address this matter any further. But clearly, that statement is highly improbable." [Op. at 598–599.] We, on the other hand, can easily conceive of beatings that do not leave scars; they might even be administered in such a way as not to do so.

(3) "It's very unlikely that the respondent would have been able to travel from other destinations to the United States under Mr. Hafiz Sulman's name, without Mr. Sulman's knowledge. There must have been some arrangements made between the two." [Op. at 599–600.] In contrast, we do not know why Abdulrahman could not have traveled without Sulman's knowledge. Indeed, how could he have communicated with Sulman under the circumstances?

The Immigration Judge's statements barely cross the line into the realm of fact finding, although Judge Shadur is correct that, in view of our extremely narrow standard of review, we are constrained to view them as so doing. While I join in Judge Shadur's opinion, I write separately to highlight these statements and to express my extreme discomfiture with them, as they border on the cavalier. Indeed, in

my view, they come extremely close to constituting reversible error. Judges Scirica and Shadur join in this concurrence.