

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-6-2004

# Ohannessian v. Atty Gen USA

Precedential or Non-Precedential: Non-Precedential

Docket No. 03-1174

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Ohannessian v. Atty Gen USA" (2004). *2004 Decisions.* Paper 527.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/527

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 03-1174/1701
_____

SARKIS OHANNESSIAN;
KEVORK OHANES OHANNESSIAN,

Petitioners

v.

JOHN ASHCROFT, Attorney General of the United States,

Respondent

_____

On Petition for Review of an Order
of the Board of Immigration Appeals
(BIA Nos. A78-411-430, A78-411-431)

_____

Submitted Under Third Circuit L.A.R. 34.1(a)
May 6, 2004

Before: SLOVITER, FUENTES, Circuit Judges, and POLLAK,* District Judge.

(Opinion Filed:    July 6, 2004)

_____

OPINION

_____

_____

*The Honorable Louis H. Pollak, U.S. District Judge for the Eastern District of
Pennsylvania, sitting by designation.

FUENTES, Circuit Judge:

Petitioners Sarkis Ohannessian and Kevork Ohanes Ohannessian ("the Ohannessians"), Lebanese citizens, are brothers who arrived in the United States together from Lebanon. They each applied for asylum, withholding of removal, and protection under Article 3 of the Convention Against Torture ("CAT"), alleging that they experienced various incidents of harassment and beatings by Syrian Muslim government officials and by Hizbollah agents in Lebanon because of their political views, ethnicity, and faith. The Ohannessians were heard separately by two Immigration Judges ("IJs"). Both IJs denied the Ohannessians' applications, finding that their respective petitioner had failed to offer credible testimony and had failed to meet their burdens of proof and persuasion. They now appeal the Board of Immigration Appeals' ("BIA") affirmance of the denial of their applications. Because we find that the IJ's decisions are supported by substantial evidence, we affirm.

## I. Facts

The Ohanessians are Lebanese citizens of Armenian ethnicity and Christian faith who arrived in the United States in "Transit Without Visa" in October 2000. Upon arrival, they were interviewed by immigration officials and both expressed fear of returning to Lebanon. Later that month, the Ohanessians each attended a "credible fear" interview, where they related to asylum officers that they had been subjected to various incidents of persecution, including detentions and beatings, by Syrian Muslim

2

government officials and by Hizbollah agents in Lebanon because they had participated in an anti-Syrian organization known as the "Lebanese Forces." The asylum officers found both of the petitioners to be credible. However, the Ohanessians were later served with a Notice to Appear and charged with violations of 8 U.S.C. § 1182(a)(6)(c)(i) for seeking admission to the United States by fraud or misrepresentation and § 1182(a)(7)(A)(i)(I) for entering the United States without a valid passport or travel documents.

Both petitioners were paroled and later applied for political asylum, withholding of removal, and protection under Article 3 of the CAT. In January and February of 2002, Kevork and Sarkis, respectively, testified at separate hearings on the merits before different IJs. At their hearings, the Ohannessians recounted largely the same incidents which culminated in their decision to leave Lebanon.

In 1990, the Ohannessians became members of a militant group called the Lebanese Forces, which opposed the Syrian Muslim regime in Lebanon and was seeking the freedom of Christians within Lebanon. The Ohannessians were about 16 and 13 years of age at the time. The Ohannessians testified that as members, they distributed anti-Syrian pamphlets, helped with wounded members, and cleaned offices. Sarkis Ohannessian testified that additionally, because of his skill as a graphic designer, he designed some of the pamphlets that were distributed. At some point after 1991, the Lebanese Forces were disbanded and the Ohannessians became clandestine members of an underground "Youth Movement" comprised of ex-members of the Lebanese Forces.

3

The Ohannessians did not give any details about their activities with this "Youth Movement," although they testified that they believe they were placed on a "blacklist" created by Syrian Intelligence in 1992 because of their membership in both organizations.

The incidents of persecution the Ohannessians testified to at their hearings occurred between the years 1996 and 2000, some six to ten years after their participation with the Lebanese Forces. In 1996, the Ohannessians were arrested by plain clothes Syrian officers at a riot, where Kevork testified he was distributing anti-Syrian pamphlets. They were taken to a government building where they were detained and beaten before they were released five hours later. Sarkis testified that the beating consisted of being tied to a chair and then being kicked, slapped, and punched.

The next incident did not occur until 1998, when the Ohanessians were detained by agents they believed to be Hizbollah members, allegedly because their names were on the "blacklist" of Lebanese Forces members. They both testified that they were put into a van and taken to a remote area where they were questioned, beaten and then released about seven hours later. The same scenario recurred with Hizbollah members twice in 1999, where once again the Ohannessians were detained, put into a van and taken to a location where they were questioned, beaten, and then released. The final incident the Ohannessians testified to occurred in the summer of 2000, when they were arrested by Syrian officials again for distributing anti-Syrian pamphlets. They were interrogated, beaten, and then released. After this final incident, the Ohannessians felt they needed to

4

leave Lebanon for fear of future persecution.

At their hearings, the Ohannessians each offered into evidence supporting documentation that consisted of affidavits from their parents corroborating the beating that occurred in 2000, a letter from a doctor who treated them for the injuries that resulted from the 2000 beating, and country reports documenting the hostility between Syrian Muslims and Armenian Christians and the persecution that Christians suffer in Lebanon. In addition, each petitioner testified on his own behalf.

After separate hearings on the merits, the Ohannessians' applications for asylum, withholding of removal, and protection under the CAT were denied. The IJ who presided over Sarkis' hearing determined that he had not met his burden of proof or persuasion for several reasons. Most importantly, the IJ did not believe his testimony to be credible because Sarkis could not corroborate any of the incidents he described, he failed to seek any medical treatment for the injuries he received until 2000, and the testimony itself was inconsistent with a supporting document and a prior credible fear interview. The IJ also noted that Sarkis' parents were present at the hearing, indicating they had no difficulty traveling from Lebanon to the United States. Finally, the IJ concluded that Sarkis' youth and his seemingly limited participation with the Lebanese Forces were unlikely to make him a target of persecution years later.

The IJ presiding over the hearing for Kevork Ohannessian reached a similar decision. The IJ found that Kevork had not testified credibly and had not met his burdens

of proof and persuasion. The IJ observed that Kevork's testimony was "labored, hesitant, drawn out, and vague" with long periods of silence and exhibition of nervous behavior such as fidgeting. In addition, the testimony contained no specificity regarding any of the alleged incidents. Kevork could not remember dates or places that the incidents occurred, nor could he describe the torture or beatings with any detail. The IJ also found that Kevork misrepresented facts to the court, attempting to conceal that he had made trips abroad from Lebanon to Syria between 1998 and 2000 by claiming that exit and entry stamps in his passport were internal checkpoints. Finally, no other evidence was provided that could substantiate his claim besides what the IJ found to be self-serving affidavits and country reports detailing general conditions in Lebanon.

The Ohannessians appealed the IJs decisions to the BIA. In each case, the BIA issued a summary affirmance of the IJ's decision. The Ohannessians now appeal the final orders of the BIA.[1] Because they each raise different issues on appeal, we discuss them separately below.

## II. Jurisdiction and Standard of Review

We have jurisdiction to review the final order of the BIA pursuant to 8 U.S.C. § 1252(a)(1). When the final order of the BIA summarily affirms or defers to the decision of the IJ, we then review the IJ's decision. *See Abdulai v. Ashcroft*, 239 F.3d 542, 549 n.

---

[1] Sarkis Ohannessian appeals the denial of political asylum and withholding of removal. Kevork Ohanes Ohanessian appeals the denial of political asylum, withholding of removal, and protection under the Convention Against Torture.

2 (3d Cir. 2001).

We review all factual determinations and credibility findings by the IJ under the substantial evidence standard. *See Abdille v. Ashcroft*, 242 F.3d 477, 483 (3d Cir. 2001). Under this standard, the court will sustain the factual determinations of the IJ unless the evidence on record compels the opposite conclusion. *See Gao v. Ashcroft*, 299 F.3d 266, 272 (3d Cir. 2002). We review a violation of due process rights de novo. *See Chong v. INS*, 264 F.3d 378, 386 (3d Cir. 2001).

### III. Discussion

The Immigration and Nationality Act ("INA") provides that the Attorney General may grant asylum to an individual who meets the definition of a refugee. 8 U.S.C. § 1158(b)(1) (2000). A refugee is defined as any person

> who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of [ ] that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion...

8 U.S.C. § 1101(a)(42)(A) (2000). The asylum applicant bears the burden of establishing eligibility for asylum. *See* 8 C.F.R. § 208.13(a) (2000); *Senathirajah v. INS*, 157 F.3d 210, 215 (3d Cir. 1998). To meet this burden, applicants must show either that they have been victims of past persecution or that they have a well-founded fear of future persecution. *See* 8 C.F.R. § 208.13(b) (2000). This showing may be made through testimony that is "credible, persuasive, and points to specific

7

facts that give rise to an inference that the applicant has been or has a good reason to fear that he or she will be singled out for persecution." *Matter of Mogharrabi*, 19 I & N Dec. 439, 443 (BIA 1987).

The standards for granting withholding of removal and protection under the CAT are higher than the standard for granting asylum. The Attorney General must withhold deportation to a country if the alien's "life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1253(h) (2000). To qualify for withholding of removal, an applicant must establish a clear probability of persecution. *INS v. Stevic*, 467 U.S. 407, 413 (1987). This requires that the applicant provide "objective evidence that it is more likely than not that the alien would be subject to persecution on one of the specified grounds." *Id.* at 429-30. Since this standard is more stringent than the standard for granting asylum, an applicant who cannot meet the asylum burden cannot meet the withholding of removal burden. *See Chang v. INS,* 119 F.3d 1055, 1059 (3d Cir. 1997).

Similarly, an applicant for protection under the CAT bears the burden of establishing that it is more likely than not that he or she would be tortured if removed to the proposed country of removal. *See Zubeda v. Ashcroft,* 333 F.3d 463, 471 (3d Cir. 2003). This also requires a showing of objective evidence to qualify for relief. *See id.*

## A. Sarkis Ohannessian

On appeal, petitioner Sarkis Ohannessian raises several arguments. First, Sarkis argues that the IJ erred by not finding that Sarkis had suffered past persecution based on political opinion. This is a factual determination made by the IJ, which we will sustain unless the evidence on the record compels the opposite conclusion. *See Abdille*, 242 F.3d at 438.

As mentioned above, the strength of Sarkis' claim rested mostly on his own testimony, which the IJ found to be not credible. The IJ listed several reasons for reaching this conclusion. Most importantly, the IJ found inconsistencies between Sarkis' testimony and the supporting documents he had submitted as corroborative evidence. Sarkis testified that in August of 2000 he was detained and beaten by Syrian officials and that afterward he sought medical treatment for his injuries. To corroborate his injuries, Sarkis submitted a letter from the doctor who treated him, Dr. Aziz Kerba. The letter, however, states that the doctor examined Sarkis in June, not August. The letter also says that Sarkis was treated in the doctor's office and then sent home for bed rest, while Sarkis testified that he was treated by the doctor in his own home.

The IJ noted a second inconsistency between Sarkis' testimony at the hearing and answers that he had given in the credible fear interview. Unlike the testimony he gave in court, in the credible fear interview, Sarkis said he had never

been arrested and that he had been detained and released several times but did not mention being beaten. No explanation was given for these discrepancies.

Next, the IJ noted that while Sarkis testified to being beaten and severely injured on several occasions prior to 2000, he apparently did not seek any type of medical treatment for those injuries nor could he provide any type of evidence to corroborate those injuries.

Third, the IJ concluded that Sarkis had not established a clear link between his activities with the Lebanese Forces as a young teenager and the incidents of persecution that occurred between 1996 and 2000. Aside from professing his belief that his name was on a Syrian "blacklist," Sarkis did not provide any other evidence that would link his activities with the Lebanese Forces to the events which occurred in 1996 until 2000.

Finally, the IJ observed that Sarkis' parents were present at the hearing. There was no indication in the record that they have ever been persecuted, detained, or beaten while in Lebanon and they were able to travel freely between Lebanon, Syria, and the United States.

As we noted in *Abdulrahman v. Ashcroft,* a credibility determination made by an IJ "will be afforded substantial deference where it is grounded in evidence in the record and where the IJ provides specific cogent reasons for her determination." 330 F.3d 587, 597 (3d cir. 2003). Here, the IJ has done so. We do not find that the

evidence on the record is strong enough to compel us to reach the opposite determination in this case. We agree that the inconsistencies in testimony and the omission of medical information for all instances except one, in light of the seriousness of the injuries alleged, certainly harm Sarkis's credibility.

We also find that it was not unreasonable for the IJ to infer that Sarkis's participation with the Lebanese Forces at age 16, cleaning offices and tending to wounded members, was unlikely to make him a target of persecution approximately ten years later. Sarkis objects to this interpretation, claiming that his role as the designer of communications paraphernalia was significant participation. However, there is no evidence in the record which corroborates Sarkis's testimony. Considering that Sarkis was particularly young at the time and that the alleged incidents did not occur until many years later, this information is not substantial enough to disturb the IJ's conclusion that Sarkis had not established a link between his participation in the Lebanese Forces and the incidents of persecution he experienced.

Without credible testimony or other corroborating evidence, Sarkis's claim fails. *See Matter of Mogharrabi*, 19 I & N Dec. at 443. Thus, we conclude that the IJ did not err by not finding Sarkis had suffered past persecution.

Secondly, Sarkis argues that the IJ erred by not finding a well-founded fear of future persecution. To demonstrate a well-founded fear of future persecution,

11

Sarkis has to show that he has a genuine fear of persecution and that such fear is reasonably based on objective evidence. *See Chang*, 119 F.3d at 1065. In finding that Sarkis had not made this showing, the IJ noted that the background material on Lebanon showed that while "there's quite a bit of fighting and tension between the two groups" the situation "appears to be substantially better and less volatile than it was some years ago." A.R. 53. Based on this information, the IJ could not conclude that Sarkis had shown he would be subjected to persecution if he returned to Lebanon.

We view this finding by the IJ as consistent with 8 C.F.R. § 208.13(b)(1)(i)(A), which requires an IJ to deny an applicant's asylum request based on past persecution if a preponderance of the evidence shows that "there has been a fundamental change in circumstances [in the country] such that the applicant no longer has a well-founded fear of persecution." Therefore, we find that the IJ did not err by not finding that Sarkis had a well-founded fear of future persecution.

Sarkis' last arguments on appeal may be dealt with briefly. First, he argues that the IJ erred by denying his applications for asylum and withholding of removal. Because the IJ correctly found that Sarkis did not meet his burdens of proof or persuasion to establish either past persecution or a well-founded fear of future persecution, it was not error to deny his application for asylum. Furthermore, because the standard for granting withholding of removal is higher than the

standard for granting asylum, the IJ also correctly denied the application for withholding of removal. *See Chang*, 119 F.3d at 1059.

Finally, Sarkis appeals the BIA's affirmance of the IJ's decision without opinion, arguing that the BIA abused its discretion by doing so. We cannot agree. As we held in *Dia v. Ashcroft*, the use of the streamlining procedure of affirmance without opinion used by the BIA is a constitutionally valid procedure. 353 F.3d 228, 237-45 (3d Cir. 2003). Therefore, there was no abuse of discretion.

## B. Kevork Ohannessian

Kevork Ohannessian also raises several arguments on appeal from the BIA's affirmance of the denial of his applications for asylum, withholding of removal, and protection under the CAT. First, we address his arguments that the IJ erred by finding him to be not credible and by finding that he had not satisfied his burdens of proof and persuasion. We reiterate that we will review these findings under the substantial evidence standard. *See Abdille*, 242 F.3d at 483.

In her oral decision, the IJ stated several reasons for finding Kevork to be not credible. First, the IJ noted that throughout the hearing, Kevork's testimony was "labored, hesitant, drawn out, and vague" with long periods of silence and exhibition of nervous behavior such as fidgeting. The IJ received the overall impression that Kevork was "[t]rying to remember what it was . . . that he was supposed to recite back in response to the questions." A.R. 56.

13

Second, Kevork seemed unable to provide any specific facts or details regarding the alleged events. The IJ mentions that Kevork could not accurately describe where or when these events occurred, nor did he give any descriptions of the beatings he received or the injuries he sustained, even when pressed by the IJ to elaborate on his answers.

The IJ's credibility determination was finally based on her observation that Kevork attempted to misrepresent facts to the court. When the IJ asked Kevork about certain stamps in his passport, he responded that these were internal checkpoints. The translator present at the hearing, however, interpreted them to be entry and exit stamps. Upon further pressing, Kevork finally admitted that these were stamps he received from traveling between Syria and Lebanon between the years 1998 and 2000. The IJ concluded that it was unlikely that someone who was allegedly targeted by the government and Hizbollah agents would be permitted to travel freely between these countries.

In *Abdulrahman*, we observed that "an immigration judge alone is in a position to observe an alien's tone and demeanor, to explore inconsistencies in testimony, and to apply workable and consistent standards in the evaluation of testimonial evidence." 330 F.3d at 597. Here, the IJ observed Kevork's behavior at the trial and concluded that, ultimately, he was unbelievable. Since we have only the record from which to conduct our analysis, we must defer to the IJ's firsthand

14

experience with Kevork's presentation of his testimony.

Furthermore, we do not think it is unreasonable to doubt Kevork's credibility based on the omissions and misrepresentations in the testimony. Surely, if the alleged incidents were severe enough to cause Kevork to flee in fear of his life, it is reasonable to expect him to remember at least some details of those events. The BIA has held that if an applicant's testimony is overly general, the BIA may find that an applicant has failed to meet the required burden of proof. *Matter of S.M.J*, 21 I. & N. Dec. 722, 729. Similarly, if Kevork was indeed a government or Hizbollah target, we agree it is unlikely that he would be allowed to travel in and out of the country for two years.

We see no other evidence in the record which would tend to establish Kevork's claim. Therefore, the IJ did not err by finding Kevork to be not credible and by finding that had not met his burden of proof and persuasion.

The second argument raised on appeal is that the IJ failed to consider the persecution of Christians that occurs in Lebanon and that the IJ erred by denying relief under the CAT. However, we find direct evidence in the record to the contrary. Before articulating the analysis in her decision, the IJ clearly states, "I've also considered the Country Conditions Report generated by the Department of State and the numerous submission [sic] made by counsel in support of the application relating to the background documentation and Country Reports." A.R.

15

In addition, the IJ specifically addresses the situation of Christians in Lebanon when addressing the availability of relief under the CAT by saying, "[c]learly the Country Reports would have tended to support a claim of just a Christian being a victim of harassment or discrimination but, in this case, the record for this respondent certainly does not meet the burden of proof nothwithstanding country conditions." A.R. 59.

In *Zubeda v. Ashcroft*, we noted that "[r]eports of generalized brutality within a country do not necessarily allow an alien to sustain his/her burden under the Convention Against Torture." 333 F.3d 463, 478 (3d Cir. 2003). Clearly, the IJ applied this standard when considering the information in the Country Condition Reports, as indicated by the IJ's statement above. We therefore conclude that there was no error by the IJ.

The third argument raised on appeal by Kevork is that his due process rights were violated during the hearing because the IJ was sarcastic, rushed him in his testimony, and impeded his ability to concentrate on the issues. As stated before, we review this claim de novo. *See Chong,* 264 F.3d at 386.

This Circuit has held that aliens facing removal are entitled to due process, which consists of three components: 1) factfinding based on a record produced before the decisionmaker that is disclosed to him or her; 2) an opportunity to make

arguments on his own behalf; and 3) an individualized determination of his interests. *Abdulai*, 239 F.3d at 549. In this case, none of the above have been denied, purposefully or inadvertently, to Kevork and therefore he has been afforded all of his due process rights. While the IJ's demeanor may have been less than pleasant–indeed, the transcript of the hearing reflects several comments we find to be singularly inappropriate such as "[y]ou either know the answers or you don't know the answers and you're making it up," and "between you taking your time . . . and him not knowing what the answers and fumbling all around we'll be here til midnight," App. at 23-24, lack of courtesy does not amount to a violation of due process. *See Abdulrahman*, 330 F.3d at 597.

At the hearing, Kevork was represented by counsel and an Arabic translator was present to interpret questions and answers. Despite the IJ's comments, she did provide numerous opportunities for Kevork to provide further explanations or details that would enhance his testimony and support his claim. The oral decision indicates that IJ properly evaluated Kevork's claim by the evidence in the record, and both the IJ and the BIA conducted an individualized review of this case. Therefore, we find that Kevork's due process rights were not violated.

Finally, Kevork objects to the BIA's affirmance of the IJ's decision without an opinion. As we previously stated, the affirmance without opinion procedure used by the BIA does not contravene any constitutional rights nor does it exceed the

17

administration's power. *See Dia*, 353 F.3d at 237-45. We find that there is no error.

## IV. Conclusion

We have conducted a thorough review of the record. Accordingly, for the reasons stated above, we will affirm the denial of political asylum, withholding of removal, and protection under the CAT.