

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-12-2005

# Astrit Ndreu v. Atty Gen USA

Precedential or Non-Precedential: Non-Precedential

Docket No. 04-2006

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"Astrit Ndreu v. Atty Gen USA" (2005). *2005 Decisions.* Paper 1205.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/1205

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**NOT PRECEDENTIAL**

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

NO. 04-2006
_____

ASTRIT NDREU; ANTIGONI NDREU; BESHIR NDREU,
*Petitioner*s

v.

ALBERTO GONZALES, ATTORNEY GENERAL OF THE UNITED STATES
OF AMERICA; DEPARTMENT OF HOMELAND SECURITY
_____

On Petition for Review of Orders of the
Board of Immigration Appeals
(Board Nos.  A79-317-392, A79-317-393 and A79-317-394)
_____

Submitted Under Third Circuit LAR 34.1(a)
April 18, 2005
Before: ROTH, FUENTES and BECKER, *Circuit Judges*

(Filed May 12, 2005  )

_____

OPINION OF THE COURT
_____

BECKER, *Circuit Judge.*

Astrit Ndreu, a native and citizen of Albania, petitions for review of the decision of the Board of Immigration Appeals ("BIA") affirming the decision of the Immigration Judge ("IJ") denying his claims for asylum, withholding of removal, and protection under the Convention Against Torture.

## I. Facts and Procedural History

Ndreu and his family were interned from 1958 to 1991, when the Communists fell, in a camp called Shtyllas. Ndreu was not released from internment until he was thirty-five years old, having spent essentially his entire life in the internment camp. During this time, he was permitted to work and go to school on the internment camp grounds. Upon release, Ndreu joined the Democratic Party (DP) and the Association of the Ex-Politically Persecuted. He went to Tirana and began working for the Chamber of Commerce in 1993 and pursued a college degree.

Ndreu claimed that, during the 1997 governmental collapse, a bomb was set off at a hotel where he had helped organize a DP meeting. The police were called but did not respond, leading Ndreu and others to suspect that the police were involved in the bombing. The next day another explosion occurred at the home of a relative, who also was active in the DP. Ndreu also suspected that this incident was politically motivated. On the way back from this same DP meeting to Tirana, his five-car convoy was stopped and an unknown person shot at the convoy, wounding his cousin in the leg.

Shortly thereafter, in June 1997, the Socialist Party came into power. During the

initial period of Socialist control, Ndreu claimed that there were peaceful DP demonstrations in Tirana; however, Ndreu began to fear for his life. He testified that he "was afraid that someone may attack [him] or kill [him] and other supporters of the Democratic Party. But thank[s] to [his] supporters and . . . the few people he knew at the police, nothing in particular happened to him." AR 155. He claimed that a friend, who was a DP supporter, was killed by the police in 1998, and that the leader of the DP was killed on September 12, 1998, by people who were widely believed to be involved with the police and supporters of the Socialist Party. AR 154, 156. During this time, Ndreu claimed that he participated in rallies and meetings for the DP, but felt he was constantly under surveillance, in particular because in 1998 someone (he vacillated between saying this person was a relative or a friend) warned him that he was on a "hit list."

On June 19, 1999, Ndreu was dragged out of his car by two people who stole the car. While they let him go, he says the assailants claimed they would "take [his] life" next time. AR 162. Ndreu reported the incident to the police, but said that the police would not respond because the assailants had some connection to the police inspector. AR 162. Ndreu admitted that he was not physically injured by the incident. According to Ndreu, the police inspector was fired ten days after this incident, but, it was not clear whether he was terminated because of anything related to the car incident.

Nrdeu came to the United States on February 8, 2000, on a tourist visa. His wife Antigoni and minor son Beshir followed on October 13, 2000, also on tourist visas. On

April 19, 2001, they were issued Notices to Appear, each conceded removability, but sought asylum and withholding of removal. The IJ denied the asylum claims, and the BIA affirmed without opinion.

Generally, the IJ found Ndreu to be credible, but she found as a legal matter that Ndreu did not establish an asylum claim. First, the IJ found that the years of internment did constitute past persecution; however, she held that country conditions had changed so fundamentally with the fall of the Communist government as to rebut any presumption of future persecution that might arise from those prior years of persecution. The IJ stated, "Although is quite clear as crystal that the respondent was persecuted for 35 years of internment, the application for asylum can not be granted on that bas[i]s. Fundamental changes in Albania preclude it." A11 ; *See Abdulrahman v. Ashcroft*, 330 F.3d 587, 592 n.3 (3d Cir.2003)) ("The presumption [of future persecution] . . . is rebutted where the Government establishes by a preponderance of the evidence that . . . conditions in the applicant's country have changed so as to make his or her fear no longer reasonable.").

Our review is limited by the "substantial evidence" standard, under which "the administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). The determination that an asylum applicant faced past persecution, or has a well-founded fear of future persecution, is a factual conclusion subject to this deferential review. *Gao v. Ashcroft*, 299 F.3d 266, 272 (3d Cir. 2002). We therefore must uphold the IJ's findings if they are

4

"supported by reasonable, substantial, and probative evidence on the record considered as a whole." *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992).

## II. Discussion

### A. Post-1992 Allegations of Persecution

The IJ found that none of the other specific incidents which occurred after 1992, such as the bombing of the hotel and the home of Ndreu's relative, the shooting at the convoy of cars, and the car-jacking, constituted past persecution. As to the bombing of the hotel and the relative's home in 1997, the IJ found there was a lack of evidence as to who was responsible for the bombings or that Ndreu or his family were targeted because of their political activities. A15. The IJ similarly concluded that there was not sufficient evidence of the motive or the identity of the perpetrators in the shooting at the convoy of cars or the 1999 car-jacking to establish a persecution claim.

While the IJ may have gone too far in discounting Ndreu's supposition that there was some sort of political motivation for these incidents, particularly with regard to the 1999 car-jacking, the IJ's finding that these incidents were not past persecution is supported by substantial evidence. Foremost is the fact that in 1997, at the time the bombings and the shooting occurred, the country was in a virtual state of anarchy in which violence abounded. The IJ found that, without more evidence about the assailants in each case, these incidents might have been part of the general violence going on at that time. *See Lie v. Ashcroft*, 396 F.3d 530, 535 (3d Cir. 2005) (requiring evidence that a

5

robbery was perpetrated "on account of" a protected ground, particularly where similar acts of robbery occurred with regularity in Indonesia).

With respect to the car-jacking, the IJ found a similar lack of evidence that the police orchestrated this incident or that it was politically motivated, finding Ndreu's testimony "unconvincing as to whether that was a crime against him calculated to steal his car or whether it was an offense against him calculated to threaten him because of his political opinion." AR 22. Moreover, the IJ found that the car-jacking was not sufficiently severe to constitute persecution because Ndreu "needed no medical care and does not actually testify to any severe harm or really even any severe threats against the respondent." AR 21-22. *See Lie*, 396 F.3d at 536 ("[T]wo isolated criminal acts, perpetrated by unknown assailants, which resulted only in the theft of some personal property and a minor injury, is not sufficiently severe to be considered persecution."). These conclusions by the IJ are supported by the record, and so, in our view, there is substantial evidence to support the IJ's conclusion that this incident did not rise to the level of past persecution.

### B. Well-Founded Fear of Future Persecution

After establishing that there was no post-1992 persecution, the IJ went on to conclude that Ndreu had not established a well-founded fear of future persecution. First, the IJ found that Ndreu did not exhibit a subjective fear of future persecution, in particular because he traveled widely in Europe (as his passport reflected) during this

6

period and returned to Albania after each trip. The IJ reasonably inquired, "If in fear, why return?" A24. Additionally, the IJ was troubled by the fact that Ndreu continued to remain in Albania, indeed in the same home and job, for several years after these incidents occurred, finding that he "did not act as a true refugee." A25.

Second, the IJ held that Ndreu had not established that, objectively, he has reasonable grounds to fear return to Albania. First, she found that there is no evidence Ndreu "participates in a party that is currently the subject of intense political persecution in Albania," pointing to the State Department reports which indicate that the DP has access to the media, has been able to run in elections, and has won in several instances. AR 24-25. Thus, the IJ held that "the Court cannot find that the mere fact that the respondent is a member of the Democratic Party and is Albanian suffices to compel the Court to find . . . he has a reasonable or well-founded fear of future persecution in Albania." AR 26.

The IJ was certainly correct that circumstances have changed fundamentally since 1991 such that any presumption arising from prior persecution is rebutted by changed country conditions. The conclusion that country conditions have changed is supported, *inter alia*, by the evidence in the State Department Report in the record.[1] The IJ also had

_____

[1]Ndreu complains that the IJ also relied upon the British Home Office Assessment to determine country conditions in Albania and as a guide in questioning the petitioner on direct and cross-examination. There does not appear to be any error in the IJ's reliance on this document, particularly since she made clear that she used this document as a reference and corroborated it with the State Department report findings. A7.

substantial evidence to support her conclusion that Ndreu did not establish a well-founded fear of future persecution based both on the evidence of his subjective fear and the objective lack of persecution of members of the Democratic Party today in Albania.

The petition for review will be denied.