

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-24-2008

# Tutisani v. Atty Gen USA

Precedential or Non-Precedential: Non-Precedential

Docket No. 07-2641

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"Tutisani v. Atty Gen USA" (2008). *2008 Decisions.* Paper 806.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/806

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

IMG-145                                                    NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————————

No. 07-2641

———————————

POTOLA TUTISANI; BARDI KALANDADZE;
DAVID KALANDADZE,

Petitioners

v.

ATTORNEY GENERAL OF THE UNITED STATES,

Respondent

———————————

On a Petition For Review of an Order
of the Board of Immigration Appeals
Agency Nos. A95-365-593, A95-363-594
& A95-365-595
Immigration Judge: Miriam K. Mills

———————————

Submitted Pursuant to Third Circuit LAR 34.1(a)
July 9, 2008

Before: AMBRO, FISHER and JORDAN, Circuit Judges

(Opinion filed July 24, 2008)

———————————

OPINION

———————————

PER CURIAM

Petitioners Potola Tutisani, her husband, Badri Kalandadze, and son, David

Kalandadze, are natives and citizens of the Republic of Georgia. Tutisani and her son entered the United States without inspection on August 22, 2001, and Tutisani shortly thereafter applied for asylum under Immigration and Nationality Act ("INA") § 208(a), 8 U.S.C. § 1158(a), and withholding of removal under INA § 241(b)(3), 8 U.S.C. § 1231(b)(3), and the Convention Against Torture, 8 C.F.R. §§ 1208.16(c), 1208.18, claiming past persecution and alleging that she feared returning to Georgia because she is Abkhazian, a minority ethnic group in Georgia.[1] Tutisani and her son were served with a Notice To Appear for removal proceedings on March 4, 2002, alleging that they were removable under INA § 212(a)(6)(A)(i), 8 U.S.C. § 1182(a)(6)(A)(i), as aliens present in the United States without being admitted or paroled.

Tutisani's husband was lawfully admitted on February 22, 1998 as a nonimmigrant visitor for pleasure with authorization to remain until August 21, 1998. He remained beyond that period without authorization and also was served with a Notice To Appear for removal proceedings on March 4, 2002, alleging that he was removable under INA § 237(a)(1)(B), 8 U.S.C. § 1227(a)(1)(B), as an alien who remained in the United States for a time longer than permitted. Tutisani's husband and son were derivative asylum applicants whose claims were based solely on her application.

In her asylum application and testimony at her removal hearing, Tutisani explained

---

[1] An alien who is not in removal proceedings may file an asylum application with the Department of Homeland Security. Compare 8 C.F.R. § 1208.4(b)(1), (2) with § 1208.4(b)(3). Tutisani's case subsequently was referred to an Immigration Judge.

that her husband is Georgian and thus their marriage is a mixed one. In 1993, after they had been married for seven years, civil conflict broke out in the Abkhazian region and 300,000 Georgians were expelled as an Abkhazian separatist movement engaged in ethnic cleansing. Several of her family members also were expelled. In turn, Abkhazians were expelled from Georgia. Tutisani, who did not live in the Abkhazian region, was not a supporter of the separatist movement but she was a vocal supporter of her people nonetheless. The civil war in the Abkhazian region made life difficult for her in her hometown of Rustavi. Her Georgian employer forced her to resign from her position at a bank in October 1993. When her husband complained about the dismissal, the manager told him to mind his own business and that he ought to have been ashamed to be married to an Abkhazian. Tutisani further testified that her son was mocked at school because of his Abkhazian ethnicity. His teachers mistreated him and set his classmates against him. More than once he was beaten up by his peers.

Tutisani's husband was terminated from his bank position in July 1996, three years after she was forced to resign. In her asylum application, Tutisani stated that her husband's boss told him that he did not wish to employ trouble-makers who were married to enemies of Georgia. Neither Tutisani nor her husband were ever able to find regular jobs again. In addition to the loss of their jobs, she and her husband received telephone calls, in which the unidentified caller threatened the family with death if they did not leave Georgia. On February 22, 1997, after a celebration of her son's birthday, Tutisani's

husband was brutally beaten by unknown assailants, and she was beaten as well. He remained in the hospital for six days. In April 1997, the family moved to the village of Bukistsikhe where her husband's parents lived, and there they were finally safe from the hostilities directed at them based on her ethnicity. Shortly thereafter, her husband managed to obtain a visa and he came to the United States.

Tutisani was denied a visa, so she and her son remained in Bukistsikhe. In March 1999, because things had quieted down, she returned to Rustavi, but the threatening calls started up again, and, on June 15, 1999, Tutisani was beaten by two men who used ethnic slurs and stopped only when others appeared on the scene. Her son testified that, on March 10, 1999, his arm was broken during a fight that started over the fact that his mother was Abkhazian. In addition, three strangers tried to abduct him in September 2001. Tutisani and her son obtained fraudulent passports and Mexican visas and fled. They were smuggled across the border near Arizona and then flew to Newark, New Jersey, where they reconnected with her husband.

The Immigration Judge denied all relief on January 9, 2004, finding the allegations of persecution incredible. Several inconsistencies were noted. Tutisani's son testified that he was involved in a confrontation over his mother's ethnicity for the first time in March 1999. He said that before that, however, he had a good relationship with fellow students, and he was not mistreated by his teachers or other students. He did not recall that his mother was ever beaten. Tutisani's husband testified that when he was laid off by

the bank, he was told only that staff was being reduced, and he did not confront his wife's employer about her forced resignation. The IJ also noted that there was a lack of objective evidence that the civil war in the Abkhazian region of Georgia caused hostility toward Abkhazians in other areas of Georgia and specifically in the family's home town of Rustavi. Furthermore, Tutisani's only independent witness, a nurse who treated her husband during his hospitalization following the February 1997 assault, testified that she knew of no Georgians harming Abkhazians or members of mixed marriages, and she did not have any first-hand knowledge of the source of Tutisani's husband's injuries. The IJ thought it implausible that Tutisani would be targeted for persecution by Georgians, given that she was not a supporter of the Abkhazian separatists. The IJ also found no connection between Tutisani's forced resignation and her husband's termination. Finally, the IJ concluded that, even assuming arguendo that past persecution was credibly established, Tutisani could relocate to her husband's parents' village where she previously lived safely.

Tutisani appealed to the Board of Immigration Appeals. While that appeal was pending, Tutisani was selected as a Diversity Visa (DV) Lottery Program winner.[2]

---

[2] Congress instituted the DV program to provides visas to individuals from countries with low immigration admissions to the United States. Coraggioso v. Ashcroft, 355 F.3d 730, 732 (3d Cir. 2004) (citing 8 U.S.C. § 1153(c)). A diversity visa qualifies an alien for permanent resident status, 8 U.S.C. § 1255(a), and, if an alien qualifies to receive a visa under the program, that person's spouse and children under the age of twenty-one are entitled to visas as well, 8 U.S.C. § 1153(d). However, the total number of lottery winners exceeds the number of diversity visas available. Thus, a lottery winner obtains only the right to apply to receive a visa through the DV Program. Id. at 732.

Tutisani filed a motion to remand with the Board for purposes of adjusting her status based on the DV lottery selection. On April 19, 2005, the Board adopted and affirmed the IJ's denial of asylum and related relief. The Board agreed that Tutisani failed to meet her burden of showing by credible testimony that she was persecuted in Georgia or had a well-founded fear of persecution if returned to Georgia, especially given the contradictory testimony. Furthermore, she was able to live safely in another village without incident for approximately a year. The Board remanded the matter to the IJ for further consideration of the adjustment of status issue under the DV lottery program for 2005.

Ten days later, on April 29, 2005, notice was mailed to counsel of record, App. 127, setting a hearing date before the IJ for October 3, 2005. On September 9, 2005, Tutisani, through counsel, filed a motion to advance the calendar hearing on her adjustment of status application because the lottery program was set to expire on September 30, 2005. App. 117. The IJ received the motion "at the last minute," and telephoned counsel on September 30, 2005 "to see what [they] could do." App. 101. Counsel informed the IJ that Tutisani was ineligible for adjustment of status anyway, App. 101-02, and so the IJ convened a hearing on October 3, 2005. The IJ ordered the family removed to Georgia, reasoning that "[r]espondent's counsel has acknowledged the respondents are statutorily ineligible for adjustment under Section 245(i), and, accordingly, has not filed an applications [*sic*] for relief. Respondents have also rejected voluntary departure based on their request to appeal this decision." (Oral Decision of

6

Immigration Judge, 10/3/05, at 2.)  On May 2, 2007, the Board affirmed without opinion pursuant to 8 C.F.R. § 1003.1(e)(4).  Tutisani and her family have petitioned for review.

We will deny the petition for review.  We have jurisdiction to review final orders of removal pursuant to 8 U.S.C. § 1252(a)(1).  When the Board summarily affirms, the decision we review is the IJ's.  Dia v. Ashcroft, 353 F.3d 228, 245 (3d Cir. 2003) (en banc).  Under INA § 208(b), the Attorney General has the discretion to grant asylum to "refugees."  8 U.S.C. § 1158(b); see also Immigration & Naturalization Serv. v. Cardoza-Fonseca, 480 U.S. 421, 428 n.5 (1987).  Section 101(a)(42)(A) of the INA defines a "refugee" as a person unable to return to her country of "nationality . . . because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion . . . ."  8  U.S.C. § 1101(a)(42)(A).

The alien bears the burden of proof of establishing that she is a refugee and that she has suffered past persecution or has a well-founded fear of persecution.  See 8 C.F.R. § 1208.13(a); Gao v. Ashcroft, 299 F.3d 266, 272 (3d Cir. 2002).  If past persecution is established, then the asylum applicant is presumed to have a well-founded fear of persecution.  See 8 C.F.R. § 1208.13(b)(1); Shardar v. Att'y Gen., 503 F.3d 308, 312 (3d Cir. 2007).  This presumption may be overcome if the government can establish either that "(1) '[t]here has been a fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution'; or (2) '[t]he applicant could avoid

7

future persecution by relocating to another part of the applicant's country of nationality . . . and . . . it would be reasonable to expect the applicant to do so.'" Id. at 312-13 (quoting 8 C.F.R. § [1]208.13(b)(1)(i)). If the alien cannot show past persecution, she may still establish a well-founded fear of future persecution by demonstrating a subjective fear of persecution, and that a reasonable person in the alien's circumstances would fear persecution if returned to the country in question, Zubeda v. Ashcroft, 333 F.3d 463, 469 (3d Cir. 2003).

To establish entitlement to withholding of removal under section 241(b)(3) of the INA, 8 U.S.C. § 1231(b)(3), the alien must demonstrate a "clear probability" of persecution through the presentation of evidence that it is more likely than not that she would be subject to persecution if deported. See Mulanga v. Ashcroft, 349 F.3d 123, 132 (3d Cir. 2003). This standard is more demanding than the standard for asylum, and, therefore, an alien who fails to establish her eligibility for asylum "necessarily fails to meet the standard of withholding of removal under INA § 241(b)(3)." Lukwago v. Ashcroft, 329 F.3d 157, 182 (3d Cir. 2003). To establish entitlement to withholding of removal under the Torture Convention, an applicant must show that "he or she is more likely than not to be tortured in the country of removal." 8 C.F.R. § 208.16(c)(2) & (4).

Adverse credibility determinations are reviewed under the substantial evidence standard. Xie v. Ashcroft, 359 F.3d 239, 243 (3d Cir. 2004); see also Immigration & Naturalization Serv. v. Elias-Zacarias, 502 U.S. 478, 481 (1992). Under this standard, the

8

Board's credibility determination "must be upheld on review unless 'any reasonable adjudicator would be compelled to conclude to the contrary.'" Xie, 359 F.3d at 243 (quoting INA § 242(b)(4)(B), 8 U.S.C. § 1252(b)(4)(B)). Although an immigration judge must provide "'specific[,] cogent reasons'" for her adverse credibility finding, Dia, 353 F.3d at 250, such a finding is accorded substantial deference. We do not overturn a credibility finding simply because we would reach a different conclusion. See Gabuniya v. Att'y Gen., 463 F.3d 316, 321 (3d Cir. 2006). Section 101(a)(3) of the REAL ID Act allows a trier of fact to consider any inconsistency, inaccuracy or falsehood in an asylum applicant's written or oral statements, regardless of whether they go "to the heart of the applicant's claim," but this provision "applies only to cases where the applicant applied for asylum or other relief after May 11, 2005," and accordingly does not apply to this case. See Chukwu v. U.S. Attorney General, 484 F.3d 185, 189 (3d Cir. 2007).

The evidence of record does not compel the conclusion that Tutisani met her burden of showing by credible testimony that she was persecuted in Georgia or has a well-founded fear of persecution if returned to Georgia. See 8 C.F.R. § 1208.13(a); Gao, 299 F.3d at 272. The IJ's finding of contradictory testimony was supported by specific, cogent reasons which relate to key aspects of her asylum claim. See Xie, 359 F.3d at 243; 8 U.S.C. § 1252(b)(4)(B). Tutisani's written statement and testimony were inconsistent with the testimony of her husband and son. In her asylum application and testimony, she

9

stated that her husband's boss told him that he was being fired because "he had an Abkhazian wife." App. 250-51, 707. Her husband, however, testified that the only reason given by his boss for his termination was staff reductions. App. 319. Her testimony that her husband was indignant about her forced resignation from the bank, and that he confronted her manager about the real reason for her dismissal, was in conflict with his testimony that he did not say anything about his wife's forced resignation because he wanted to maintain his position. App. 318.

In her asylum application, Tutisani stated that her son was mistreated by his teachers in school and was mocked and beaten up by his peers due to her ethnicity, but this statement conflicted with his testimony that he had a good relationship with his classmates prior to the fight on March 10, 1999. App. 324. Furthermore, her son could not recall any incidents where his mother, as opposed to his father, was physically harmed on account of her ethnicity. App. 321-24. Tutisani's only independent witness testified she was unaware of any attacks against individuals on account of their Abkhazian ethnicity during the nine years she worked at the hospital in Rustavi. App. 300-04.

In short, there was no connection between the conditions in Georgia and the most disturbing events alleged, the July 1997 attack on her husband and March 1999 attack on her son. Random incidents of violence do not constitute persecution, see Lie v. Ashcroft, 396 F.3d 530, 534-36 (3d Cir. 2005), and, although Tutisani contends that the violent attacks, without protection or response from the police, were persecutory, she has failed

10

to establish that the acts were "on account of" her ethnicity, id. at 535. Furthermore, her other materials do not support her claim of mistreatment of ethnic Abkhazians outside of Abkhazia or of mistreatment of couples of mixed Abkhazian and Georgian ethnicity by ethnic Georgians. See Dia, 353 F.3d at 249 (adverse credibility determination must be appropriately based on inconsistent statements, contradictory evidence, and inherently improbable testimony in view of the background evidence on country conditions). Neither the State Department's Country Report on Human Rights Practices in Georgia nor the Profile of Asylum Claims and Country Conditions in Georgia indicate that Abkhazians in mixed marriages were being targeted by ethnic Georgians, or that there is a pattern or practice of persecution of Abkhazians in other parts of Georgia outside of Abkhazia. App. 459-84. In addition, the Asylum Profile did not list asylum claims based on Abkhazian ethnicity as a claim commonly seen from Georgian applicants. App. 461-66.

We thus conclude that the record supports the Board's affirmance of the IJ's adverse credibility finding in this case, and does not compel a conclusion to the contrary. Because Tutisani has failed to present evidence that any reasonable factfinder would be compelled to find that the testimony was credible, we must uphold the Board's decision. See Abdulrahman v.Ashcroft, 330 F.3d 587, 598 (3d Cir. 2003). Furthermore, insofar as Tutisani failed to credibly establish her eligibility for asylum, she necessarily failed to meet the higher standard of eligibility for withholding of removal under the INA. See

11

Lukwago, 329 F.3d at 182.  And, although credibility for asylum and withholding of removal purposes does not defeat an alien's ability to establish her eligibility for protection under the Torture Convention, see Zubeda, 333 F.3d at 476, denial of relief was nonetheless appropriate here because the record discloses no evidence of the likelihood of torture.

Tutisani contends that the IJ erred by excluding certain identity documents that were not authenticated, but these exhibits were entered into the record and the IJ did not base the denial of her application on the lack of corroboration of her identity.  Therefore, her argument on the exclusion of evidence lacks merit.  Tutisani also claims that her due process rights were violated by the IJ's failure to schedule a hearing prior to the expiration of the eligibility period for her diversity visa.  Aliens have a "right to a full and fair hearing that allows them a reasonable opportunity to present evidence on their behalf."  Cabrera-Perez v. Gonzales, 456 F.3d 109, 115 (3d Cir. 2006) (per curiam).  We exercise plenary review over procedural due process claims.  See Bonhometre v. Gonzales, 414 F.3d 442, 446 (3d Cir. 2005), cert. denied, 546 U.S. 1184 (2006).  Generally, to prevail on a due process claim, the "alien must show substantial prejudice," see Singh v. Gonzales, 432 F.3d 533, 541 (3d Cir. 2006), but if the process provided was not constitutionally deficient in the first place, the question of prejudice need not be reached, cf. Walters v. Reno, 145 F.3d 1032, 1044 (9th Cir. 1998) (discussing Matthews v. Eldridge, 424 U.S. 319 (1976), and observing that question of prejudice is separate

12

from question whether procedure is constitutionally deficient).

We note that a hearing notice was mailed to counsel of record on April 29, 2005, App. 127, and Tutisani waited until September 9, 2005, twenty-one days prior to the end of the eligibility period,[3] before moving to advance the hearing date. No plausible explanation has been provided for this delay of over four months, which simply cannot be attributed to the IJ. In any event, as to the adjustment of status issue, Tutisani cannot show prejudice. The setting of eligibility dates for visa programs is not under the Board's or the IJ's jurisdiction. Congress did not intend for the DV Program to result in issuance of a visa after the end of a given fiscal year. See Coraggioso, 355 F.3d at 734. In order to be eligible for adjustment of status under INA § 245(i), a visa petition must have been filed on or before April 30, 2001. 8 U.S.C. § 1255(i). Since Tutisani's application for the 2005 diversity visa lottery would have been filed long after this date, she was not eligible for adjustment of status from within the United States. Her only recourse was to depart the United States and apply for consular processing from abroad. See 22 C.F.R. § 42.61 et seq. She left herself virtually no window of opportunity by delaying the filing of her motion to advance the calendar hearing until September 9, 2005. Notice of the hearing date was sent well in advance of the end of the fiscal year.

Had Tutisani acted promptly upon receipt of the notice, and had the IJ *then* failed to act, we would face a more difficult issue, but that is not what happened here. In fact,

---

[3] DV-2005 winners are ineligible to receive diversity visas after September 30, 2005.

Tutisani's counsel was aware of the applicable law on the adjustment of status issue. App. 102-03. The IJ, when confronted with the impending expiration of Tutisani's eligibility, offered to address the matter in advance of the scheduled hearing on the last day of eligibility, but counsel declined, because no application for adjustment of status was ever filed. Therefore, Tutisani cannot establish that she was prejudiced by any actions of the IJ with respect to the scheduling of a hearing on the adjustment of status application.

Tutisani further contends that she would have requested voluntary departure pursuant to 8 U.S.C. § 1229c(a)(1) (alien may be granted 120-day voluntary departure period in lieu of being subject to proceedings regardless of how long she has been physically present), had the hearing been scheduled sooner, and for this reason also the IJ's failure to act before September 30, 2005 constitutes a denial of due process. However, the September 9, 2005 motion to advance the hearing made no mention whatever of any application for voluntary departure. Furthermore, a request for voluntary departure under section 1229c(a)(1) must be made prior to or at the master calendar hearing, 8 C.F.R. § 1240.26(b)(1)(i)(A), and such a request would have had to have been made well before notice of the hearing was mailed to counsel in April 2005. Tutisani goes on to contend that, although an alien can request a 60-day voluntary departure period at the conclusion of removal proceedings under 8 U.S.C. § 1229c(b), and she was ineligible for this type of voluntary departure due to her lack of physical presence in the

14

United States for one year prior to service of the Notice to Appear, 8 U.S.C. § 1229c(b)(1)(A), the IJ could have at least granted voluntary departure to her husband who had been present for years prior to the initiation of removal proceedings. But the record discloses that her husband previously *declined* to apply for voluntary departure because his wife and son were not also eligible. App. 331-32. We thus conclude that the IJ did not deprive Tutisani of a fair opportunity to be heard on the voluntary departure issue either.

For the foregoing reasons, we will deny the petition for review.